EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff-Appellee,

v.

PACIFIC PRESS PUBLISHING ASSOCI-
ATION, Defendant-Appellant.

No. 80–4189.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 13, 1981.

Decided May 10, 1982.

As Amended on Denial of Rehearing and
Rehearing En Banc July 27, 1982.

Malcolm T. Dungan, San Francisco, Cal., argued, for defendant-appellant; James H. Quirk, Melinda S. Collins, Brobeck, Phleger & Harrison, San Francisco, Cal., on brief.

Colleen O'Connor, E.E.O.C., Washington, D.C., for plaintiff-appellee.

Before TRASK and CANBY, Circuit Judges, and HILL,* District Judge.

TRASK, Circuit Judge:

## I

This is an appeal from the district court's holding that Pacific Press Publishing Association ("Press"), a nonprofit religious publishing house, violated section 703(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–2(a) (1976),[1] by denying Lorna Tobler monetary allowances paid to similarly situated male employees. Press also was held in violation of section 704(a) of Title VII, 42 U.S.C. 2000e–3(a) (1976),[2] for terminating Tobler's employment in retaliation for her filing charges and participating in proceedings under the Act. Because Congress clearly intended to protect employees of religious institutions under Title VII, and because the enforcement of Title VII does not infringe religious freedom under the facts of the present case, we affirm the judgment of the district court.

Press, a nonprofit corporation incorporated under California law, is affiliated with the Seventh-Day Adventist Church[3] and engages in the business of publishing, printing, advertising and selling religiously oriented material.[4] All Press employees are required to be members of the church in good standing. Lorna Tobler worked at

---

* Honorable Irving Hill, Senior United States District Judge for the Central District of California, sitting by designation.

1. Section 2000e–2: (a) Employer practices. It shall be an unlawful employment practice for an employer—

 (1) ... to discriminate ... with respect to [an employee's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive ... any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

2. Section 2000e–3: (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

3. In appellant's brief, counsel describes the church membership as consisting of approximately 3,419,159 baptized adult members and 4,059,621 Sabbath School members "essentially indistinguishable from the rest of the public except, among other things, that they do not smoke, drink, dance or play cards, and they go to church on Saturday." Brief for Appellant at 15.

4. In addition to "Signs of the Times" a monthly magazine published by Press, it also publishes other official documents, including the Seventh Day Adventist "Church Manual" (rev.1971); the "Seventh Day Adventist Yearbook" 1973–74 and other similar books and papers.

Press from 1960 until 1975. Her title throughout was "editorial secretary."[5]

Until 1973, Press paid its employees in accordance with written wage scales under which married men received a higher rental allowance than single men, who in turn, received more than female employees regardless of their marital status. As a married woman, Tobler did not receive an annual utility allowance received by married men, nor was she paid automobile allowances paid to married male, single male and single female employees.

Tobler initiated charges of discrimination with the Equal Employment Opportunity Commission (EEOC) in 1972. In her position as "editorial secretary," Tobler worked for the editor of *Signs of the Times*, a monthly magazine published by Press. When she filed her initial charges, her duties included not only secretarial, but also administrative and discretionary responsibilities.[6] After Press became aware that Tobler was participating in proceedings involving similar discrimination brought by a co-worker, Merikay Silver, Tobler's duties were changed. Press gradually reassigned her discretionary and administrative duties to other workers and, by the summer of 1974, her job involved only secretarial work.[7] In October 1973 and January 1974, Tobler filed charges alleging retaliation. In September 1974, EEOC filed suit against Press under section 706(f)(2) of Title VII, 42 U.S.C. 2000e–5(f)(2) (1976), seeking preliminary relief to enjoin further retaliation against Silver and Tobler.

The governing body of the Adventist Church is the General Conference of Seventh-Day Adventists. The General Conference in Session, a meeting of all members of the General Conference, is the only body empowered to change church doctrine. Although complete authority over the management of the publishing house, including employment decisions, rests with Press' Board of Directors, both the General Conference and its Executive Committee may make recommendations and give counsel to Press. On February 14, 1975, a committee of the General Conference passed a resolution recommending that Tobler and Silver be terminated from their employment at Press. The committee found both employees failed to meet the requisite high standards of adherence to Bible teachings and church authority because they had sued the church and "were at variance with the church and unresponsive to spiritual counsel." On February 19, 1975, pursuant to the committee recommendation, Press dismissed Silver and Tobler. The EEOC then instituted this action. The parties do not dispute that the Adventist Church and Pacific Press correctly followed their own internal procedures in ordering Tobler's dismissal.

During her employment at Press and throughout this litigation, Tobler has remained a member in good standing of the church. Membership in the Seventh-Day Adventist Church is held through one's local church congregation, and jurisdiction for disciplining church members resides with the local church. Tobler's local church certified her membership in good standing subsequent to her dismissal from Press.

This case presents two issues for the court to consider. First, whether Title VII of the Civil Rights Act of 1964 prohibits a religious publishing house from (a) discriminating in wages because of sex, and (b) retaliating against and ultimately discharging an employee because of her participation in Title VII proceedings. Second, whether application of Title VII in the context of this case infringes the Free Exercise and Establishment clauses of the First Amendment.

---

5. For a detailed history of the present litigation and related cases, see the decision in the district court, *EEOC v. Pacific Press Publishing Association*, 482 F.Supp. 1291 (N.D.Cal.1979).

6. *See EEOC v. Pacific Press Publishing Association*, 482 F.Supp. at 1298 n.16.

7. For a description of Tobler's reduced duties, see *EEOC v. Pacific Press Publishing Association*, 482 F.Supp. at 1299 n.18.

## II

Press presents both statutory and constitutional arguments against application of Title VII to its employment policies. Press contends that Title VII both expressly and implicitly exempts Press's employment practices from Title VII's coverage. It further argues that if Title VII does apply to Press in the present circumstances, that application violates the First Amendment religion clauses.

Before reaching Press' constitutional arguments, this court must determine whether the dispute may be resolved on statutory grounds. The nature of our inquiry is established by *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). We must first determine whether the proposed application of the statute "would give rise to serious constitutional questions." *Id.* at 501, 99 S.Ct. at 1319. If so, we cannot find the statute applicable unless there is an " 'affirmative intention of Congress clearly expressed' " to apply it. *Id.*

We conclude that the application of Title VII in the circumstances of this case presents serious constitutional questions. Because we have also concluded that these questions must be faced and decided, we postpone discussion of these issues until we reach their merits. The seriousness of the constitutional questions will, we think, be amply demonstrated in that discussion.

▮ We also conclude that Congress clearly expressed the intention that Title VII apply in the present circumstances. Press's claims of entitlement to express and implicit exemptions are refuted by the legislative history of Title VII and its amendments.

During the enactment of the Civil Rights Act of 1964 and in later amendments, Congress specifically considered the scope of Title VII protection within religious institutions and rejected proposals that provided religious employers a complete exemption from regulation under the Act. Title VII provides only a limited exemption enabling Press to discriminate in favor of co-religionists. Section 702 of Title VII, 42 U.S.C. 2000e–1, provides the limited exception available to religious employers:

> This subchapter shall not apply . . . to a religious corporation, association, educational institution or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution or society of its activities. . . .

The legislative history of this exemption shows that although Congress permitted religious organizations to discriminate in favor of members of their faith, religious employers are not immune from liability for discrimination based on race, sex, national origin, or for retaliatory actions against employees who exercise their rights under the statute.

The original version of the 1964 Civil Rights Act passed by the House, H.R. 7152, contained a broad exemption entirely excluding religious employers from coverage under the Act: "§ 703. This title shall not apply . . . to a religious corporation, association, or society." H.R.Rep.No.914, 88th Cong., 1st Sess. 10 (1963), *reprinted in* EEOC, Legislative History of Title VII and XI of Civil Rights Act of 1964 at 2010 (1968) ("1964 Legis.Hist.") 1964 U.S.Code Cong. & Ad.News p. 2355. A substitute bill proposed by Senators Humphrey, Dirksen and Mansfield adopted a more limited exemption, making Title VII applicable to religious employers, but permitting them to employ individuals of a particular religion to perform work connected with its religious activities. *See* "Congressional Debate on Titles VII and XI Introduction," in 1964 Legis.Hist. at 3001, 3004, 3050; 110 Cong. Rec. 12812. The Senate declined an opportunity to revert to a total exemption for religious organizations proposed in a later substitute bill by Senators Clark and Case.[8] After debate on the various proposals, the Senate passed the Dirksen-Mansfield substi-

---

8. The Clark-Case substitute bill was virtually identical to the exemption provided in the original bill. 1964 Legis.Hist. 3035; 110 Cong.Rec. 12864.

tute. *See* 1964 Legis.Hist. at 11. The House accepted the substitute without amendment. *See* Title VII, § 702, 78 Stat. 255 (1964) (current version at 42 U.S.C. § 2000e–1).

During the 1972 Amendments, Senators Ervin and Allen proposed that the employment practices of all religious institutions be removed completely from EEOC jurisdiction. *See* Legislative History of Title VII of the Equal Employment Opportunity Act of 1972 at 1229–1230 ("1972 Legis.Hist.") 118 Cong.Rec. 1982. Again the Senate rejected the blanket exemption.

The Senate accepted a subsequent proposal by Senator Ervin that broadened the scope of the exemption only slightly to allow religious employers to discriminate on the basis of religion with respect to all—not just religious activities. 1972 Legis.Hist. at 789; 118 Cong.Rec. 7170. Although the Senate accepted the subsequent amendment, this action does not support Press' argument that section 702 broadly exempts religious organizations from charges of discrimination based on nonreligious grounds. The legislative history shows that Congress consistently rejected proposals to allow religious employers to discriminate on grounds other than religion: "[church-affiliated] organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin." Section by Section Analysis of H.R. 1746, The Equal Employment Opportunity Act of 1972, 1972 Legis. Hist. 1845; 118 Cong.Rec. 7167.

### III

Every court that has considered Title VII's applicability to religious employers has concluded that Congress intended to prohibit religious organizations from discriminating among their employees on the basis of race, sex or national origin. *E.g., EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277 (5th Cir. 1981); *EEOC v. Mississippi College,* 626 F.2d 477 (5th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981). In *Mississippi College,* the Fifth Circuit examined EEOC jurisdiction over employment

policies at a Baptist college in light of *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), and held that the employment relationship between the college and its faculty was not exempt from Title VII scrutiny. 626 F.2d at 485. Despite the college's "pervasively sectarian" character and purpose, the court held that the college must comply with an EEOC subpoena issued in connection with an investigation into charges of discrimination. *Id.* at 489. In *Southwestern Baptist Theological Seminary, supra,* the Fifth Circuit held that the seminary must comply with EEOC filing requirements with respect to its employees who were not working in the capacity of a minister.

■ Press argues that because Tobler's work included discretionary and administrative responsibilities, her employment involved religious activity and was outside the application of Title VII. Even if Title VII is deemed to cover such employment, Press argues that such coverage would be a violation of Press' First Amendment rights. Press' position necessarily depends for support on *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972), and *NLRB v. Catholic Bishop of Chicago, supra.* In our opinion, any reliance on those authorities is misplaced. We recognize that Tobler's position initially included discretionary and administrative responsibilities, and that the wage discrimination took place while she was discharging such responsibilities. But we hold that even when her job duties did include these responsibilities, she was not exempt from EEOC coverage. We reject the argument that the exemption provided by section 702 applies to all actions taken by an employer with respect to an employee whose work is connected with the organization's "religious activities." *EEOC v. Mississippi College,* 626 F.2d at 484, citing *McClure v. Salvation Army, supra.*

■ In *McClure,* the Fifth Circuit held that application of Title VII to the employment relationship between a church and its ministers violated the First Amendment.

The court implied an exemption for ministers emphasizing that the relationship between a church and its ministers is its "lifeblood": "The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *Id.* at 558–59. Tobler was not a minister, nor an author of religious texts. Moreover, Press has not shown that her duties go to the heart of the church's function in the manner of a minister or a seminary teacher. The facts of the present case do not require this court to examine in depth the scope of the exemption recognized in *McClure.* We conclude simply that Tobler's position, even during the period of her broadest duties, did not fulfill the function of a minister, nor was her employment at Press the type of critically sensitive position within the church that *McClure* sought to protect.

Significantly, the Fifth Circuit refused to broaden the *McClure* exemption to include the faculty at Mississippi College, noting that:

> The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church ad-

ministration and thus purely of ecclesiastical concern.

*EEOC v. Mississippi College,* 626 F.2d at 485. The Fifth Circuit applied this reasoning to the various positions at Southwestern Baptist Seminary and determined that although the seminary faculty were ministers in the *McClure* sense, neither the support staff nor the administrators whose functions related to the seminary's finance, maintenance, or non-academic departments were entitled to minister status under *McClure. EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d at 283–85.[9] Similarly, Tobler's duties at Press, even during the period of her broadest responsibility, were more analogous to those of the support staff at the seminary and those of the regular faculty at Mississippi College, than to the duties of a minister.

## IV

## Press' Constitutional Arguments

■ Pacific Press argues that any legislation affirmatively intended to apply to religious activity is always and necessarily unconstitutional. Because the publishing company is "pervasively sectarian" and "everything Pacific Press does is part of religion," Press contends that EEOC regulations violate the First Amendment to the extent they reach any Press activities. Press also asserts that Congress lacks authority to legislate with respect to religious institutions because each provision of the Bill of Rights overrides the powers expressly granted to Congress in the Constitution.

9. The Fifth Circuit carefully scrutinized the type of work performed by the seminary's employees and protected positions which involved duties a minister performs. As an example of the court's reasoning in distinguishing between the exempt and nonexempt administrative positions at the seminary, the court stated: "The President and Executive Vice President of the Seminary, the chaplain, the deans of men and women, the academic deans, and those other personnel who equate to or supervise faculty should be considered ministers as well. On the other hand, those administrators whose function relates exclusively to the seminary's finance, and other non-academic departments, though considered ministers by the Seminary, are not ministers as we used that label in

*McClure* [*McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972)]. Their positions are akin to support staff positions." *Southwestern Baptist Seminary,* 651 F.2d at 284–85. The court decided that all the teaching faculty at the seminary qualified as ministers and were thereby exempt from EEOC's filing requirements. *Id.* at 283. But even though most of the seminary's support staff consisted of seminary students or their spouses or the spouses of faculty, the court rejected the argument that their positions within the seminary were sufficiently religiously-oriented to exempt their jobs from EEOC's filing requirements. *See id.* at 283–286.

Thus, Press insists that Title VII, enacted pursuant to the commerce clause, is unconstitutional if applied to religious organizations. Even if Press were correct in asserting that the commerce clause is the sole source of Congress' authority in enacting Title VII,[10] its argument would still depend upon a showing that enforcement of the statute actually violated the religious clauses of the First Amendment. Press' position finds little support in the cases which interpret the Constitution's guarantees of religious freedom.[11] Press fails to prove that EEOC jurisdiction impermissibly burdens the free exercise of its religious beliefs, or that Title VII entangles the government in Press' religious activities.

## A. The Free Exercise Clause

 Although the free exercise clause prohibits legislation of religious beliefs, Press incorrectly argues that Congress lacks authority to legislate with respect to any religious activity or conduct. *E.g., Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Statutes are not invalid simply because they affect the operation of a religious organization. *See Thomas v. Review Board*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). In determining whether a neutrally based statute violates the free exercise clause, courts must weigh three factors:

(1) the magnitude of the statute's impact upon the exercise of the religious belief,

(2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and

(3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*EEOC v. Mississippi College*, 626 F.2d 477, 488 (5th Cir. 1980), *cert. denied*, 453 U.S.

912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981), *citing Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Tobler's Title VII wage discrimination and retaliatory discharge complaints will be examined separately in light of these criteria.

 We find that requiring Press to refrain from discriminating against Tobler, as required by Title VII, does not infringe Press' free exercise of its religious beliefs. Preventing discrimination can have no significant impact upon the exercise of Adventist beliefs because the Church proclaims that it does not believe in discriminating against women or minority groups, and that its policy is to pay wages without discrimination on the basis of race, religion, sex, age, or national origin. Thus, enforcement of Title VII's equal pay provision does not and could not conflict with Adventist religious doctrines, nor does it prohibit an activity "rooted in religious belief." *Wisconsin v. Yoder, supra*, 374 U.S. at 215, 92 S.Ct. at 1533. Because the impact on religious belief is minimal and the federal interest in equal employment opportunities is high, the balance weighs heavily in favor of upholding Press' liability under Title VII for its use of sexually discriminatory wage scales. As we note in the following discussion of Tobler's retaliatory discharge complaint, a total exemption for Pacific Press and similar enterprises would represent a serious conflict with the government's equal employment objectives.

Our holding is consistent with *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), *cert. denied*, 101 S.Ct. 3143 (1981), in which the court rejected the argument that application of Title VII to the employment of faculty at a pervasively sectarian college violated the free exercise clause. In *Mississippi College*, as in the present case, the

10. Press' assertion that Congressional authority for enacting Title VII was based solely on the commerce clause is inaccurate. Congress relied on section 5 of the Fourteenth Amendment in addition to the commerce clause. *Fitzpatrick v. Bitzner*, 427 U.S. 445, 453 n.9, 96 S.Ct. 2666, 2670 n.9, 49 L.Ed.2d 614 (1976).

11. The religion clauses of the First Amendment provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

employment practices subject to Title VII scrutiny did not embody religious beliefs. *Id.* at 488. Accordingly, the court found Title VII's effect ,on the free exercise of religious beliefs to be slight, and not an interference with the college's religious purpose. *Id. Mississippi College* recognizes that although EEOC jurisdiction over religious organizations may have far reaching effects should the Commission seek injunctive relief or monetary damages against a religious employer, "the relevant inquiry is not the impact of the statute upon the institution, but the impact of the statute upon the institution's exercise of its sincerely held religious beliefs." *Id.*

■ The retaliatory action taken against Tobler for her participation in EEOC proceedings presents a more serious conflict between Adventist religious beliefs and EEOC jurisdiction. Press justifies Tobler's dismissal on religious grounds, citing her violation of church doctrines which prohibit lawsuits by members against the church. Again, we follow the three-step analysis set forth above. Unlike the wage discrimination issue, there is a substantial impact on the exercise of religious beliefs because EEOC's jurisdiction to prosecute the retaliatory action taken against Tobler potentially will impose liability on Press for disciplinary actions based on religious doctrine. We find, however, that the government's compelling interest in assuring equal employment opportunities justifies this burden. By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a "highest priority." *See* S.Rep.No.872, 88th Cong., 2d Sess. pt. 1 at 11, 24 (1964); *see also, Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions. *E.g., Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), (state law prohibiting retail sales on Sunday).

Under Title VII, EEOC enforcement actions are triggered only when the individual complainant files charges with the Commission: an employee who initiates a Title VII action "not only redresses his own injury but also vindicates important congressional policy against discriminatory employment." *Alexander v. Gardner-Denver Co.,* 415 U.S. at 45, 94 S.Ct. at 1018. To permit the various Adventist institutions to retaliate against employees who challenge discrimination through EEOC procedures would defeat Congress' intention to protect employees of religious employers. The effect would be to withdraw Title VII's protections from employees at the hundreds of diverse organizations affiliated with the Adventist Church, including businesses which process food, sell insurance, invest in stocks and bonds, and run schools, hospitals, laboratories, rest homes and sanitariums.

■ Courts have emphasized the importance of protecting the individual's right to bring charges under Title VII. *E.g., Smallwood v. National Can Co.,* 583 F.2d 419, 421 (9th Cir. 1978). Moreover, Tobler has a constitutional right to inform the government of violations of federal law. *In re Quarles,* 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895) (privilege of citizenship guaranteed by the Fourteenth Amendment); *See Twinings v. New Jersey,* 211 U.S. 78, 97, 29 S.Ct. 14, 18, 53 L.Ed. 97 (1908).

■ In *United States v. Lee,* —— U.S. ——, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), the Supreme Court addressed a similar free exercise issue. The Court recognized that the Amish religion prohibits both the acceptance of social security benefits and the payment of contributions by Amish to the social security system. *Id.* —— U.S. at ——, 102 S.Ct. at 1055. Although compulsory participation in the social security system interferes with the free exercise of Amish beliefs, the Court held that the state may justify a limitation on religious freedom by showing that it is essential to accomplish an overriding governmental interest. *Id., citing Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder,* 406 U.S. 205, 92

S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The Court found mandatory participation essential to the fiscal vitality of the social security system and that the broad public interest in maintaining a sound tax system would be undermined if "denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief." *Id.* —— U.S. at ——, 102 S.Ct. at 1057. Similarly, Title VII establishes a compelling governmental interest in eliminating employment discrimination. The protection of employees who participate in EEOC proceedings from retaliatory job actions is essential to accomplish the purpose of Title VII. We reject Press' argument that the free exercise clause protects its retaliatory dismissal of Tobler for her participation in EEOC proceedings against the Adventist Church.

### B. Ecclesiastical Intra-Church Disputes

Press also claims that the district court failed to recognize that the action taken against Tobler was an unreviewable "ecclesiastical decision." Press insists that the administrative structure of the Adventist Church is such that decisions by the church's governing authority concerning religious discipline are unreviewable in civil courts. The cases cited by Press, however, involve major intra-church disputes over religious doctrines and practices. *E.g., Serbian East Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (dispute over control of the Serbian Church between a defrocked Bishop and a newly appointed Bishop).

*Serbian Diocese* does not apply to the present dispute because we are not deciding between competing church doctrines. We accept that the doctrines urged by Pacific Press represent the beliefs of the Adventist Church. We recognize that the Adventist Church favors equality in employment and discourages lawsuits by church members

against the church. Unlike a major intra-church doctrinal dispute, *see Presbyterian Church v. Mary Elizabeth Blue Hull Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), the present case concerns the failure of a religious employer to adhere to federal regulations. Although Adventist beliefs are consistent with the equal opportunity goals of Title VII, the church's prohibition of lawsuits conflicts with the necessary enforcement mechanism Congress provided to ensure equal employment and to protect employees from retaliation. We have determined that the compelling public interest embodied in Title VII simply outweighs Press' assertion that the pervasively religious nature of its activities or the exercise of its particular religious belief prohibiting civil suits immunizes Press employment policies from EEOC regulation.

Significantly, Tobler's local church could have invoked disciplinary actions such as censure or expulsion from the church which undoubtedly would qualify as ecclesiastical decisions immune from judicial review. But the discharge of Tobler from her position at Press is an action that involves more than purely religious considerations; it also conflicts with rules of conduct established by Congress for legitimate secular reasons.

### C. Press' Establishment Clause Arguments

Press also contends that Title VII violates the establishment clause because it creates impermissible EEOC entanglement with religion. Examining legislation for violations of the establishment clause follows yet another three step test: 1) the statute must have a secular purpose, 2) the primary affect of the statute must neither advance or inhibit religion, and 3) the statute must not foster excessive government entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). For reasons already discussed, we have concluded that Title VII has a secular purpose

and that contrary to Press' assertions, the statute does not have the primary effect of inhibiting religion.

 Thus, as in both *Mississippi College and Southwestern Baptist Seminary*, only the third part of the test is the crucial one. Press cites *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), to support its position that EEOC regulations excessively entangle the Commission and the church. To determine whether a statute creates excessive entanglement, courts examine the character and purpose of the institution involved, the nature of the regulation's intrusion into church affairs, and the resulting relationship between the government and the religious authority. *Lemon v. Kurtzman*, 403 U.S. at 614–15, 91 S.Ct. at 2112.

Although Press publishes only religious and religiously-oriented materials and maintains that all work performed at the publishing house involves religious activity, Press' character and purpose clearly are somewhat less sectarian than those of a seminary. In *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir. 1981), the court held that the seminary must comply with EEOC filing requirements except for the employees who were found to be ministers of the church. The court recognized that "the character and purposes of the seminary are wholly sectarian," but this finding did not support a complete exemption from all EEOC regulation. The court reversed the district court's ruling that the employment records relating to the seminary's administrative and support staff were immune from EEOC filing requirements. *Id.* at 281. The court's reasoning does not aid Press in its claim that enforcement of the EEOC regulations constitutes excessive entanglement.

 The present case is distinguishable from *NLRB v. Catholic Bishop* because neither the judgment in this suit nor Title VII's enforcement mechanisms result in any ongoing scrutiny of Press' operations. The potential for ongoing entanglement or continuous supervision of church affairs by the government's regulations is the critical entanglement issue which deserves the most emphasis. In *Catholic Bishop*, 440 U.S. at 502–03, 99 S.Ct. at 1319, the court found a serious risk of excessive entanglement because the enforcement of the National Labor Relations Act's mandatory collective bargaining provisions at a sectarian school would have empowered the NLRB to judge the good faith beliefs of clergy-administrators, to assess the validity of positions central to the school's religious mission and to issue cease and desist orders. EEOC cannot issue coercive orders and lacks independent authority to initiate actions to enforce Title VII. As discussed earlier, EEOC actions must be initiated by an employee filing charges with the Commission. Although the district court's award of monetary damages to Tobler may inhibit Press from discharging employees who participate in Title VII proceedings, this remedy does not amount to continuous supervision of the kind the Supreme Court sought to avoid in *Catholic Bishop.*

Although Press insists that *NLRB v. Catholic Bishop, supra*, signals a major change in the Supreme Court's attitude toward regulation of religious institutions, *Catholic Bishop* does not support Press's sweeping position that all employees at a sectarian publishing house are immune from EEOC scrutiny. In a case decided after *Catholic Bishop*, the Fifth Circuit considered the nature of EEOC's intrusion into a sectarian school's operations and found the relationship created between the government and the college was acceptably limited both in scope and effect. *EEOC v. Mississippi College*, 626 F.2d at 487–88. Furthermore, EEOC's relationship to religious employers threatens no more entanglement than other statutes which regulate employee compensation at religious institutions. *See generally Marshall v. Pacific Union Conference of Seventh-Day Adventists*, [1977] Emp.Prac.Dec. (CCH) 7806 (C.D.Cal.1977) (Equal Pay Act); *Mitchell v. Pilgrim Holiness Church Corp.*, 210 F.2d 879 (7th Cir.), *cert. denied*, 347 U.S. 1103, 74 S.Ct. 867, 98 L.Ed. 1136 (1954) (minimum wage law).

The judgment of the district court is AFFIRMED.