**AMERICAN BAPTIST CHURCHES IN THE U.S.A., et al., Plaintiffs,**

v.

**Edwin MEESE III, and Alan Nelson, Defendants.**

**No. C–85–3255 RFP.**

United States District Court, N.D. California.

March 30, 1987.

---

Ellen Yaroshefsky, Morton Stavis, Center for Constitutional Rights, New York City, Marc Van Der Hout, Abby Ginzberg, National Lawyers Guild, Ephraim Margolin, Sandra Coliver, San Francisco, Cal., for plaintiffs.

Joseph P. Russoniello, U.S. Atty., Andrew M. Wolfe, Asst. U.S. Atty., San Francisco, Cal., for defendants.

### MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

### INTRODUCTION

Defendants Edwin Meese III, Attorney General of the United States, and Alan Nelson, Commissioner of the Immigration and Naturalization Service, move to dismiss this case for failure to state a claim upon which relief can be granted.

### BACKGROUND

This case is brought by two groups of plaintiffs, each of which asserts distinct and independent causes of action. The first group of plaintiffs is composed of various religious organizations, which sue on their own behalf and on behalf of their members. These organizations allege that, "as a matter of religious faith and practice, [they] have determined to offer sanctuary to persons from El Salvador and Guatemala." Complaint ¶ 1. They contend that the defendants' prosecutions of religious sanctuary workers under 8 U.S.C. § 1324(a), the criminal harboring and transporting statute, interferes unconstitutionally with their first amendment right to the free exercise of religion. They seek preliminary and permanent injunctions barring defendants from continuing or commencing any prosecutions of persons affiliated with the religious movement of sanctuary, as well as a declaratory judgment that such individuals are entitled to provide assistance to aliens in this country who are seeking refuge from El Salvador and Guatemala.[1]

The second group of plaintiffs is composed of three Central American refugee service organizations, which sue on their own behalf and on behalf of refugees from El Salvador and Guatemala. These organizations contend that international treaties and customary international law confer upon Salvadoran and Guatemalan refugees the rights to temporary refuge in this country. In addition, these plaintiffs argue that the defendants' discriminatory application of immigration laws violates the fifth amendment right of persons from El Salvador and Guatemala to equal protection of the laws. Finally, the plaintiffs have asserted a tort action for the reckless endangering of refugees' lives by willfully sending them to countries where they are subject to wrongful death, assault, battery, and intentional infliction of emotional harm. The refugee organizations seek preliminary and injunctive relief "barring the defendants from arresting and deporting Salvadorans and Guatemalans to those countries until such time as war, prosecution and the commission of human rights violations in those countries have ceased," as well as "a declaratory judgment that persons fleeing war, persecution and widespread human rights violations in Gua-

---

**1.** On November 6, 1986, Congress amended the criminal harboring and transporting statute. *See* Immigration Reform and Control Act of 1986, S.Res. 1200, 99th Cong., 2d Sess. § 112. Because the plaintiffs contend that religious sanctuary workers may not be targeted for pros-ecution under the amended law, they have now limited their request for a religious exemption to prosecutions for activity engaged in on or before November 6, 1986. *See* Plaintiffs' Supplemental Memorandum at 1–2, 4–5.

temala and El Salvador are entitled to temporary refuge within the United States until such time as those conditions no longer exist in those countries." Complaint at 51.

A memorandum of amici curiae had been submitted in support of the plaintiffs by the National Association of Criminal Defense Lawyers, California Attorneys for Criminal Justice, and Human Rights Advocates. This memorandum asserts that the refugees have a fundamental due process right not to be returned to countries where they face a substantial risk of suffering violations of basic human rights.

In their motion to dismiss, defendants challenge the standing of both groups of plaintiffs to raise the claims asserted. They also take the position that neither group has stated viable claims upon which relief could be granted. They therefore urge that the court dismiss the case in its entirety.

## DISCUSSION

*I. Standing of Religious Organizations to Assert First Amendment Claims*

■ In order to determine whether a plaintiff has standing to assert a legal claim, courts must consider both constitutional and prudential limitations on their authority. To satisfy the basic requirements for standing under Article III of the Constitution, a plaintiff must demonstrate the existence of three factors: (1) a threatened or actual distinct and palpable injury to the plaintiff; (2) a fairly traceable causal connection between that injury and the challenged conduct of the defendant; and (3) a substantial likelihood that the relief requested will redress or prevent the injury. *See Olagues v. Russoniello,* 797 F.2d 1511, 1517 n. 7 (9th Cir.1986); *see also Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984).

■ In addition to these three constitutional limitations, the courts have also developed the following three prudential limitations on standing: (1) the plaintiff must assert his own rights and "cannot rest his claim to relief on the legal rights or interests of third parties," *Warth v. Seldin,* 422

U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); (2) the plaintiff's injury must not be "shared in substantially equal measure by all or a large class of citizens," *id.;* and (3) the plaintiff's interest must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). *See generally McMichael v. County of Napa,* 709 F.2d 1268, 1270 (9th Cir.1983). In determining whether the plaintiffs have satisfied the constitutional and prudential requirements for standing, we must accept as true the facts stated in the plaintiff's complaint. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").

The plaintiffs here allege that the prosecutions of religious sanctuary workers, and the threat of such prosecutions, "have the purpose and effect of preventing or discouraging members or the staff of religious organizations from participating in the religious practice of sanctuary and directly interfere with the plaintiffs' performance of their religious duties." Complaint ¶ 2. The plaintiffs further allege:

Plaintiffs' performance of their religious obligations to refugees requires the willing voluntary support of large numbers of their constituents in order to provide shelter and food for refugees. The fear engendered by the prosecutions aforesaid deters some individuals from rendering assistance to refugees from El Salvador and Guatemala and thereby interferes with plaintiffs' performance of their religious duties and the exercise of their rights under the first amendment.

Complaint ¶ 53. According to the plaintiffs, this interference with their first amendment rights is directly attributable to the defendants' actions and would be

remedied if the court granted the injunctive and declaratory relief sought.

Defendants counter that plaintiffs have done no more than allege their own subjective fear of prosecution, and have failed to demonstrate that they or any of their members are actually imminently threatened with prosecution under the statute. Defendants claim it to be "settled law" that "[a]llegations of subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). Furthermore, defendants interpret *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), to hold that constitutional challenges to the enforcement of a criminal statute may only be brought by one against whom prosecution is "imminent."

Defendants have read into *O'Shea* a broader principle than it actually pronounced. In that case, the Supreme Court held that the plaintiffs did not have standing to sue a magistrate and a circuit court judge for their allegedly discriminatory pattern and practice of bond-setting and sentencing in criminal cases. None of the plaintiffs there claimed to be serving unlawful sentences, and none were on trial or awaiting trial before the defendants. In stating its decision that the plaintiffs lacked standing, the Court carefully limited its holding: "Under these circumstances, where respondents do not claim any constitutional right to engage in conduct proscribed by ... presumably permissible state laws, or indicate that it is otherwise their intention to so conduct themselves, the threat of future injury from the alleged course of conduct they attack is simply too remote to satisfy the case-or-controversy requirement and permit adjudication by a federal court." *Id.* at 498, 94 S.Ct. at 677. Here, the plaintiffs do claim a constitutional right to engage in the proscribed conduct, and they do indicate that it is their intention to engage in such conduct. Thus, *O'Shea* is inapplicable.

*Laird* is also not directly on point. There, the plaintiffs challenged an Army civilian surveillance system on first amendment grounds. "The plaintiffs, however, were not targets of the surveillance, thus any chilling effect resulted merely from their knowledge of the surveillance activities." *Olagues v. Russoniello,* 797 F.2d 1511, 1518 (9th Cir.1986) (en banc). In this case, by contrast, the chilling effect upon the sanctuary workers plainly results from more than mere knowledge of the prosecutions. Rather, plaintiffs claim to be actual targets of the harboring prosecutions because they are engaging in the very conduct that is being prosecuted. *Cf. id.* at 1518–19 (holding that an organization whose members were "potential targets of future prosecutions" had standing to seek injunctive relief).

The court agrees with the defendants that the Article III case-or-controversy requirement demands more than an "imaginary or speculative" threat of prosecution. *See Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 749–50, 27 L.Ed.2d 669 (1971). However, it is "not required that all of those subject to overbroad regulations risk prosecution to test their rights." *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965); *see also Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."). The question in this case is whether the plaintiffs have alleged a threat of prosecution that is sufficiently "real and immediate" to satisfy the requirements of Article III. *O'Shea,* 414 U.S. at 494, 94 S.Ct. at 675.

The court finds that the plaintiffs have alleged a "real and immediate" threat of prosecution. Their complaint contains a list of 21 cases in which defendants have already been prosecuted for aiding Salvadoran and Guatemalan refugees, and some of those defendants are alleged to belong to religious organizations that are among the plaintiffs here. *See* Complaint ¶¶ 40, 41. Furthermore, the complaint also alleges that defendants have authorized the infil-

tration of plaintiff religious organizations by informants and undercover agents. *See* Complaint ¶ 42. Finally, the defendants themselves repeatedly assert that they have a compelling interest in enforcing the statute against sanctuary workers. *See, e.g.,* Defendant's Memorandum in Support of Motion to Dismiss at 10 (arguing that a religious exemption would "emasculate the government's efforts to enforce the immigration laws"). Under these circumstances, the court is convinced that the plaintiffs have alleged a threat of prosecution sufficiently "real and immediate" to provide a constitutional basis for standing. *See generally Hardwick v. Bowers,* 760 F.2d 1202, 1205 (11th Cir.1985) (concluding that the likelihood of prosecution can be gauged by examining the state's interest in enforcement, its past pattern of enforcement, and the plaintiff's interest in engaging in the proscribed activity), *aff'd,* — U.S. —, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Thus, we find that the plaintiffs have "allege[d] personal injury fairly traceable to the defendants' allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984).

Furthermore, none of the prudential limitations on standing are applicable to the plaintiff's first amendment claim. The plaintiff religious organizations allege unconstitutional interference with their own religious activities, and their claim thus does not rest "on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The injury alleged by these organizations is unique to them, and is not "shared in substantially equal measure by all or a large class of citizens." *Id.* Finally, the plaintiffs' interests in conducting what they claim to be religiously motivated activity is plainly "within the zone of interests to be protected" by the first amendment. *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). Thus, the court concludes that the plaintiffs have standing to assert the first amendment claim based upon the direct injuries alleged to have been suffered by the religious organizations.

Plaintiffs also argue that even if they have failed to show sufficient injury to themselves, they meet the requirements of "associational standing" to assert the constitutional rights of their members. The parties agree that an organization must meet the following requirements for associational standing to apply:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Naturally, however, the parties disagree as to whether these circumstances are present in this case. The court concludes that the first two requirements for associational standing are met in this case, but the third is not.

The defendants argue that the individual members of the plaintiff organizations could not have sued in their own right because they would be required instead to assert their rights as defenses to actual prosecutions. However, as noted above, the plaintiffs in this case have alleged a "real and immediate" threat of prosecution that would permit an individual to sue for injunctive relief without "first expos[ing] himself to actual arrest or prosecution." *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974). Thus, this argument has no merit.

The defendants next contend that the plaintiffs have not shown the individual interests at stake to be "germane" to the organizations' purposes, because they have failed to allege that participation in the sanctuary movement is "a necessary part of their religious practices." Defendants' Memorandum in Support of Motion to Dismiss at 6. However, it can hardly be argued that "germane" is synonymous with

"necessary." The plaintiffs have asserted that their individual members participate in the sanctuary movement "as a matter of religious faith and practice." Complaint ¶ 1. If the plaintiffs can prove this to be true at trial, then they will clearly have demonstrated that the individuals' interests are "directly related" to the purposes of the religious organizations. *See Olagues v. Russoniello,* 797 F.2d 1511, 1519 (9th Cir.1986) (en banc). Thus, the court finds that the second prong of the *Hunt* test is satisfied here.

Finally, defendants contend that the participation of individual members is necessary to resolve this suit because the first amendment claim compels an inquiry into the centrality and sincerity of each individual's religious belief. The court finds this argument to be convincing. The plaintiffs in this case have requested injunctive relief barring the prosecution of all "persons affiliated with the religious movement of sanctuary." Complaint at 50. In order to prove that all persons "affiliated" with that movement are entitled to a religious exemption, however, the plaintiffs would have to show that the participation of each and every member is "rooted in religious belief, not in 'purely secular' philosophical concerns." *Callahan v. Woods,* 658 F.2d 679, 683 (9th Cir.1981). In order to satisfy this burden, the religious organizations would have to put on the stand every member whose rights they seek to protect in this suit. Thus, the third prong of the *Hunt* test is not satisfied.

■ In conclusion, the court finds that the plaintiff religious organizations have standing to assert that the prosecution of religious sanctuary workers interferes with their own religious missions, because they have alleged that the threat of prosecutions has a deterrent effect upon persons who would otherwise be willing to participate in the sanctuary movement. Of course, if the plaintiff religious organizations are unable to prove the existence of such a deterrent effect at trial, the court will be compelled to conclude that they lack standing to assert their claims. The court also finds that the plaintiff religious organizations lack standing to assert the rights of their members to a religious exemption from prosecution, because the claim asserted requires the participation of the individual members in the lawsuit.

## II. The Merits of the Religious Organizations' First Amendment Claim

■ This case presents another in a long line of federal cases attempting to strike a delicate balance between the accomodation of religiously motivated activity and the necessity to preserve order through rules of general applicability. Our federal courts have long recognized that the latter goal must on occasion yield to the former in order to maintain a society in which toleration of varying religious beliefs can thrive. Thus, the Supreme Court has interpreted the first amendment to require religious exemptions for compulsory education laws, *see Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), flag salute requirements, *see West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), and even mail fraud prosecutions, *see United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). On the other hand, the Court has also recognized that carrying the principle of religious exemption to its extreme "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1878). Thus, the Court has rejected claims of religious exemption for bigamy prosecutions, *see id.,* Social Security payments, *see United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), and, most recently, Air Force dress regulations, *see Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986).

In this circuit, the courts have devised a three-part test for evaluating facially neutral laws that incidentally restrict the free exercise of religious belief. Under this test, courts weigh the following factors: (1) the magnitude of the statute's impact upon the exercise of religious belief,

(2) the existence of a compelling state interest justifying the burden imposed upon the exercise of religious belief, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state. *EEOC v. Pacific Press Publishing Association,* 676 F.2d 1272 (9th Cir.1982); *see also Callahan v. Woods,* 736 F.2d 1269, 1273 (9th Cir.1984). The parties to this case disagree concerning the application of each of these three factors.

With respect to the first prong of the *EEOC* standard, defendants assert that the enforcement of the statute has no impact at all upon religious *belief* because plaintiffs are free to believe whatever they want. *See* Defendants' Memorandum in Support of Motion to Dismiss at 9. This argument conveniently ignores the fact that the issue is whether the statute affects the *exercise* of religious belief, not whether it affects the beliefs themselves. As noted above, the plaintiff religious organizations have alleged that prosecutions of religious sanctuary workers "have the purpose and effect of preventing or discouraging members or the staff of religious organizations from participating in the religious practice of sanctuary and directly interfere with the plaintiffs' performance of their religious duties." Complaint ¶ 2. If the plaintiffs can prove this allegation at trial, they will plainly have shown that the statute has a substantial impact upon the exercise of religious belief.

The defendants also renew their contention that the plaintiffs have failed to allege that their religious beliefs require them to participate in the sanctuary movement, or that the sanctuary movement plays a central role in their religious lives. However, construing the facts in plaintiffs' favor, as

we must on a motion to dismiss, *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), the court concludes that the plaintiffs might well prove that the statute's impact upon the exercise of their religious beliefs is substantial. On the basis of the allegations in the plaintiffs' complaint, we simply cannot determine as a matter of law that the impact of the prosecutions is minimal.[2]

With respect to the second prong of the *EEOC* test, the importance of the governmental interest, the Ninth Circuit had held that "it is useful to look first at the importance of the value underlying the regulation, and second, at the degree of proximity and necessity that the chosen regulation bears to the underlying value." *Callahan v. Woods,* 736 F.2d 1269, 1274 (9th Cir. 1984). In this case, the defendants contend that the value underlying the criminal harboring statute is the enforcement of the country's immigration laws, and that the statute bears a close proximity and necessity to that value.

The Supreme Court has "repeatedly emphasized the importance which sovereign nations place upon controlling entry through their borders." *United States v. Elder,* 601 F.Supp. 1574, 1578 (S.D. Texas 1985). Since the *Chinese Exclusion Case,* 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889), and *Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893), the Court has never deviated from the proposition that congressional control of the borders is "inherent in national sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government." *Kleindienst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576,

---

**2.** In *United States v. Merkt,* 794 F.2d 950 (5th Cir.1986), the Fifth Circuit found in a sanctuary prosecution case that the criminal harboring statute did not unduly burden the free exercise of religion because: (1) the statute contained no explicit prohibition on religious practices or beliefs; (2) it was not shown that the appellants' religious beliefs mandated participation in the sanctuary movement; and (3) the appellants could have assisted Salvadorans through other

legal means. *See id.* at 956. This court finds the first factor to be irrelevant because it is true of all cases in which religious exemptions from facially neutral statutes are requested. *See, e.g., United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (granting religious exemption from prosecution under facially neutral mail fraud statute). The other two factors involve factual questions that are not appropriate for resolution in a motion to dismiss.

2582–83, 33 L.Ed.2d 683 (1972). " '[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1477–78, 52 L.Ed.2d 50 (1977) (citation omitted). Furthermore, it is beyond dispute that a statute criminalizing the harboring of undocumented aliens bears a close "proximity and necessity" to the compelling interest in control of the nation's borders. As the Fifth Circuit Court of Appeals put it in a recent case involving the prosecution of sanctuary workers: "The prohibition on the landing and transport of illegal aliens represents but one facet of the comprehensive legal framework governing entry into the United States and admission to its citizenship." *United States v. Merkt,* 794 F.2d 950, 955 (5th Cir.1986). Thus, the court finds that there exists a compelling governmental interest bearing a close proximity and necessity to the criminal harboring statute at issue here.

Turning to the third and final part of the *EEOC* test, the court must determine "the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state." This appears to be purely a factual question, and the Ninth Circuit has treated it as such. *See Callahan v. Woods,* 736 F.2d 1269, 1274–75 (9th Cir.1984) (remanding to district court for further consideration of factual evidence on the issue of how much a religious exemption would impede the objectives of a statute). Plaintiffs here claim that they will produce at trial statements by defendant Alan B. Nelson and other high-ranking INS officials to the effect that the sanctuary movement poses little threat to enforcement of immigration laws. Thus, even conceding the importance of the governmental interest underlying the harboring statute, the plaintiffs hope to show that that interest would minimally be affected by granting an exemption for religious sanctuary workers.

Taking all three of the *EEOC* factors together, we must now determine whether the plaintiffs could prove any set of facts entitling them to the relief sought. The defendants urge this court to hold that the compelling governmental interest in enforcement of the nation's immigration laws outweighs as a matter of law any impact upon the plaintiffs' right to the free exercise of religion. However, the compelling governmental interest underlying the statute cannot be viewed in isolation, and must be analyzed in conjunction with the third factor of the *EEOC* test: the extent to which an exemption would impede the objectives sought to be advanced. If, as the plaintiffs allege, they can prove at trial that the governmental interest underlying the statute would be minimally impeded by granting an exemption, then they could conceivably prevail on their first amendment claim. Because the extent to which an exemption would impede the governmental interest is an issue of fact to be resolved at trial or on summary judgment, dismissal is inappropriate at this stage in the case.

Finally, the court notes that even if plaintiffs are ultimately unsuccessful in their claim to a religious exemption from prosecution, they may still prevail on their contention that defendants have prosecuted sanctuary workers "in bad faith for the sole purpose of harassing members and employees of religious groups who are participating in the sanctuary movement." Complaint ¶ 52. There can be no dispute that deliberately discriminatory prosecution on the basis of religious affiliation would contravene the first amendment. *See Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 1531–32, 84 L.Ed.2d 547 (1985). Even if we were to take judicial notice of the fact that the statute is regularly enforced against defendants who make no claim of religious motivation, as defendants urge, we think the plaintiffs could still conceivably make out a case of religious harassment. Because plaintiffs have alleged and could conceivably prove facts entitling them to relief on their first amendment claims, the court declines to grant the defendants' motion for dismissal with respect to this issue.

### III. Standing of Refugee Organizations to Assert Temporary Refuge Claims

■ The second group of plaintiffs in this case, which is composed of three Cen-

tral American refugee organizations, asserts that all Salvadoran and Guatemalan refugees within this country have a right under international treaties and customary international law to temporary refuge within this country. This group of plaintiffs also asserts that the defendants' discriminatory denial of temporary refuge to Salvadorans and Guatemalans violates the equal protection clause, and provides the basis for a cause of action sounding in tort. These plaintiffs advance three independent bases for their standing to assert these rights: (1) direct injury to the organizations, (2) injury to third parties whom the organizations serve, and (3) injury to the members of the two plaintiff membership organizations. We analyze each of these arguments in turn.

The plaintiffs first contend that, as refugee service organizations, they themselves suffer the following injuries due to the defendants' discriminatory denial of temporary refuge to Salvadorans and Guatemalans:

> Plaintiffs Committee of Central American Refugees, Centro Presente, Inc. and Casa Oscar Romero are Central America refugee service organizations which have suffered as organizations in their efforts to meet the needs of their constituents as a result of defendants' policies and practices toward Guatemalan and Salvadoran refugees. The organizations have had to divert limited resources into unnecessary, unwarranted and discriminatory legal proceedings, and overwhelming burdens have been placed on their members, staff and services as a result of the treatment by defendants of these refugees. Threats of prosecution have caused potential donors, members and volunteers to avoid association with these groups and have negatively affected their ability to carry out their purposes.

Complaint ¶ 43.

Defendants contend that these allegations are insufficient to confer standing because otherwise "anyone could acquire standing to assert the rights of anyone else simply by making some expenditure of re-

sources to help that other person." Defendants' Reply Memorandum at 15. However, there is no evidence in the record that these plaintiffs have fraudulently incurred expenses simply in order to acquire standing, and this is therefore not the occasion to decide that question. We must assume for the purposes of this motion that the plaintiffs are sincere in their efforts to assist Salvadorans and Guatemalans. Furthermore, because the court must accept as true the facts stated in the complaint, *see Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975), we find that the refugee organizations have alleged harm sufficient to satisfy the prerequisites of Article III. According to the allegations of the complaint quoted above, the refugee organizations are suffering injuries from the defendants' actions that directly affect their ability to accomplish their primary goals and purposes. Thus, at this stage in the litigation, we cannot conclude that the plaintiffs' complaint fails to satisfy the "case or controversy" requirement.

Despite the fact that the constitutional requirements for standing are met in this case, the plaintiff refugee organizations lack prudential standing for two reasons. First, the refugee organizations are clearly resting their claim for relief "on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 495, 95 S.Ct. 2197, 2203, 45 L.Ed.2d 343 (1975). The harm that these organizations claim to have suffered is not traceable to any alleged violation of their own legal rights. Rather, the plaintiffs allege this harm to have occurred through a violation of the legal rights of Salvadorans and Guatemalans in this country. As the Supreme Court itself has noted: "Federal courts must hesitate before resolving a controversy, *even one within their constitutional power to resolve,* on the basis of the rights of third persons not parties to the litigation." *Singleton v. Wulff,* 428 U.S. 106, 113, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976) (emphasis supplied). There are two reasons underlying this prudential limitation on standing:

First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not.... Second, third parties themselves usually will be the best proponents of their own rights.

*Id.* at 113–14, 96 S.Ct. at 2873–74 (citations omitted).

Despite this general reluctance to permit litigants "to vindicate the constitutional rights of some third party," *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953), the Supreme Court has conceded that the general rule "should not be applied where its underlying justifications are absent." *Singleton*, 428 U.S. at 114, 96 S.Ct. at 2874. The Court has relied upon two factual elements to determine whether the general rule should apply in a particular case: (1) the relationship of the litigant to the person whose rights he seeks to assert, and (2) the ability of the third party to assert his own rights. *See id.* at 114, 115–16, 96 S.Ct. at 2874–75. In *Singleton* itself, for example, the Court held that two physicians had standing to assert the rights of women patients against governmental interference with the abortion decision. The Court noted the closeness of the relationship between doctor and patient, and pointed out that a woman cannot safely secure an abortion without the assistance of a physician. The Court also commented upon the fact that the physicians themselves were intimately involved in the constitutionally protected abortion decision. Finally, the Court noted that a pregnant woman herself faced several obstacles in asserting her own rights, including the loss of her privacy and the imminent mootness of her claim. *See id.* at 114–19, 96 S.Ct. at 2874–76.

Applying the two elements of the *Singleton* test to this case, we find that the plaintiffs here should not be permitted to assert the legal rights of undocumented Salvadorans and Guatemalans. Unlike the situation in *Singleton,* there is no close or confidential relationship between the plaintiff refugee organizations and the aliens whose rights they seek to assert. In fact, most Salvadorans and Guatemalans in this country are unlikely ever to have had any contact whatsoever with these three refugee organizations. Furthermore, there are no unique obstacles preventing Salvadorans and Guatemalans from raising their temporary refuge and equal protection claims in individual suits, individual applications for asylum, or deportation proceedings. Thus, the court concludes that the general rule against the assertion of third parties' rights should be applied in this case, and the plaintiff refugee organizations therefore lack prudential standing.

These refugee organizations also lack prudential standing because their interests are not "arguably within the zone of interests to be protected" by the international laws and constitutional guarantees asserted here. *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). "Essentially, the standing question in such cases is whether the ... provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), *quoted in McMichael v. County of Napa,* 709 F.2d 1268, 1271 (9th Cir.1983). In this case, if the international law claim for temporary refuge is viable, it is obviously intended to protect aliens against being returned to countries where their lives would be endangered. Such a claim cannot properly be understood to grant a right to judicial relief for organizations assisting such aliens. The equal protection and tort claims also cannot properly be understood to provide such a right. Thus, the court concludes that the refugee organizations lack prudential standing because they are not within the zone of interests protected by the laws upon which they rely.

■ Contrary to the plaintiffs' arguments, the fact that the refugee organizations are attempting to assert the rights of aliens whom they serve does not provide any independent basis for standing. There

is no special doctrine of standing permitting organizations to assert the rights of the persons whom they serve, and the general rule against vindicating the legal rights of third parties is equally applicable in this situation. Because we have concluded that the legal requirements for asserting the rights of third parties are not satisfied in this case, the refugee associations cannot be permitted to assert the rights of these aliens.

 Finally, the two refugee organizations that are membership organizations contend that they have associational standing to assert the rights of their members under *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). However, the court finds that the plaintiffs have failed to allege facts in their complaint on the basis of which we could conclude that the first requirement for associational standing is met in this case. The complaint simply contains no allegation that these refugee organizations have any members who would have standing to sue in their own right. The complaint only states that the organizations have "Salvadorans and Guatemalans among their members." Complaint ¶ 44. It fails to state the immigration status of these aliens, and it fails to indicate whether any of these aliens have exhausted the "prescribed administrative remedy" by applying for asylum. *See Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938) (Brandeis, J.). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is the proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin,* 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975). Because the complainants here have failed "clearly to allege" such facts, their claims must be dismissed. However, in the interest of fairness, the court will grant the plaintiffs thirty days to amend their complaint to state facts sufficient to confer associational standing. If the plaintiffs choose to exercise this option, the defendants will then be permitted to renew their motion to dismiss on standing grounds as well as on the merits of the claims.

## CONCLUSION

The court denies the motion to dismiss the religious organizations' first amendment claim. The court grants the motion to dismiss the remaining claims with thirty days leave to amend to state facts in support of their argument for associational standing.

IT IS SO ORDERED.