NORTH VALLEY BAPTIST CHURCH, et al., Plaintiffs,

v.

Linda McMAHON, in her capacity as Director of the California State Department of Social Services, Defendant.

No. Civ. S-84-0767 RAR.

United States District Court, E.D. California.

Sept. 29, 1988.

Charles E. Craze, Robin S. Hom, Burlingame, Cal., for plaintiffs.

Darryl F. Mansfield, John R. Pierson, Atty. General's Office, L. Burda Gilbert, Weintraub, Genshlea, Hardy, Erich & Brown, Sacramento, Cal., for defendant.

## MEMORANDUM OPINION

RAMIREZ, District Judge.

On April 12, 1988, the above-entitled matter came on regularly for court trial before the undersigned, Charles E. Craze, Esq. and Robin S. Hom, Esq., appearing as counsel for plaintiffs and Darryl F. Mansfield, Esq. and John R. Pierson, Esq., appearing as counsel for defendant. Having considered the various pleadings, the evidence adduced at trial, and the arguments of respective counsel, the court now renders the following memorandum decision pursuant to Rule 52(a), F.R.Civ.P.:

The underlying action presents this court with several issues of constitutional magnitude. Specifically, the court is called upon to determine whether the California day

care licensing scheme, as applied to a particular religiously-affiliated preschool, withstands constitutional scrutiny under the free exercise clause, the establishment clause, the equal protection clause, and the guarantee of parental rights.

## FACTUAL BACKGROUND [1]

### A. The California Child Care Facilities Act

In one fashion or another, the provision of child day care has been regulated in California since 1937. Prompted by the recent dramatic growth in the industry, in 1984 the California Legislature took a more in-depth look at its child day care policies. In so doing, the legislature concluded that "affordable, quality licensed child care is critical to the well-being of parents and children in this state." Cal.Health & Safety Code § 1596.73(e). To achieve this goal, new legislation was created, entitled the Child Care Facilities Act (the Act), Cal. Health & Safety Code §§ 1596.70, et seq.

By this Act, the State Department of Social Services (DSS) is authorized to establish, administer, and monitor a comprehensive licensing program applicable to all day care centers. "Day care centers" are defined as facilities, other than family day care homes, which provide nonmedical personal services to persons under the age of 18 on less than a 24–hour basis.[2] Infant centers and preschools, by definition, are day care centers. Cal. Health & Safety § 1596.76.

To qualify for a license, a day care center must comply with the administrative regulations set forth in 22 Cal. Admin. Code §§ 101151, et seq.[3] Said regulations address a wide range of matters potentially affecting the health and safety of children. Among other things, these regulations impose substantial requirements in the areas of physical structure, nutrition, immunizations, child/staff ratios, record keeping, personnel, and financial disclosure.

Three regulations are of particular import in the present litigation. First, the "corporal punishment provision", § 101223(3), provides that each child shall "be free from corporal or unusual punishment, infliction of pain, humiliation, intimidation, ridicule, coercion, threat, mental abuse, or other actions of a punitive nature." Second, the "criminal record clearance provision", § 101170, provides that fingerprints shall be obtained from all administrators and caretakers at the center, and a criminal background check shall be conducted therefrom. Based on the results of these criminal background checks, the DSS maintains the authority to deny a license to a center or to deny the employment of a particular individual.[4] Third, the "religious services provision", § 101223(a)(5), provides that each child shall "be free to attend religious services or activities of his/her choice and to have visits from the spiritual advisor of his/her choice." In this context, it is conceded that the referenced "choice" of religious services and spiritual advisor is exercised by the parent on behalf of the child.

Although many day care centers, especially preschools, have a structured educational program, DSS does not regulate program content in any fashion. Indeed,

---

1. The factual recitation in this section is limited to those facts which were uncontroverted at trial and/or otherwise stipulated to by counsel.

2. A family day care home is "a home which regularly provides care, protection, and supervision of 12 or fewer children, in the provider's own home, for period of less than 24 hours per day, while the parents or guardians are away." Cal. Health & Safety Code § 1596.78. Family day care homes are also required to be licensed, but are separately regulated under the Act.

3. Unless otherwise specified, all further section references are to Title 22 of the California Administrative Code.

4. The primary function of this provision is to identify and exclude ex-offenders with a history of violent and/or sex crimes, especially where those crimes were directed against children. For this reason, DSS has no discretion to allow the employment of an individual convicted of any of the following crimes: murder, mayhem, rape, sexual battery, assaults with intent to commit a sex crime, willful cruelty to a child, and lewd and lascivious acts with a child. With respect to any other crime, DSS has discretion to permit employment upon a finding that the individual has been rehabilitated and is presently of good character. Cal.Health & Safety Code § 1596.87.

the Act specifically provides that "licensing reviews of a day care center shall be limited to health and safety considerations and shall not include any reviews of the content of any educational or training program of the facility." Cal. Health & Safety Code § 1597.05(a). Consequently, the centers within the state run the gamut from those performing simple "babysitting" services to those providing intensive academic, recreational, social adjustment, and/or religious training. In short, under the licensing scheme a day care center remains free to teach, or to not teach, on any subject and in any manner it deems fit.

Once a day care center demonstrates that it satisfies the standards set forth in the regulations, DSS then shall issue a license. However, such issuance does not end the regulatory relationship, but merely begins it. Thereafter, DSS continues to monitor compliance with its regulations. For example, the center is required to notify DSS of specified changes in operation, § 101212, and DSS is authorized to inspect the center and audit records without prior consent, § 10195. In the event of non-compliance, DSS is granted extensive enforcement powers, including the assessment of penalties and the revocation of the license. §§ 101202–101207.

Limited statutory exemptions from licensure are provided for specified types of facilities. For example, included among the exempt facilities are parent cooperatives, public recreation programs, health facilities and after-school programs. Cal. Health & Safety Code § 1596.792. All non-exempt day care centers, however, must obtain a license or face possible civil and criminal sanctions.

Most significant herein, the Act neither requires nor permits distinctive treatment for religiously-affiliated day care centers, including preschools. Like nonsectarian preschools, religiously-affiliated preschools are subject to licensure and the full attend-ant regulatory scheme under the Child Care Facilities Act.

## B.  The North Valley Baptist Preschool

In 1962, the Reverend Royal Blue formed a new church in Redding, California called the North Valley Baptist Church (the Church). A central tenet of this Church is the literal belief in the Christian teachings contained in the Bible. As an independent church, the North Valley Baptist Church is not affiliated with any other religious entity. The Reverend Blue, as pastor of the Church, serves as its head spiritual advisor.

Since its inception, the Church has been incorporated under the laws of the State of California. It operates as a tax exempt organization under both state and federal law.

In addition to Sunday worship, the Church offers a variety of other services, called "ministries", to its membership and others in the community. Such ministries are designed generally to satisfy "unmet needs" of people—whether these needs by physical, spiritual, or emotional.[5] The ministries offered by the Church include a Sunday school ministry, a bus ministry which transports people to church, a youth club ministry which fosters competition in vigorous sports, a camping ministry, an elementary school ministry, and a preschool ministry. Among other things, such ministries help train members in principles of Christian living and help promote the evangelistic outreach goals of the Church.

The Church has operated its preschool ministry, called the North Valley Baptist Preschool (the Preschool), since 1972.[6] This Preschool provides daytime care and education for approximately 50 children ages 2½ through 5. A year-round facility, the Preschool operates Monday through Friday from 7:30 a.m. to 5:30 p.m., with options for half or full time programs. Attendance at the Preschool is open to all children, including children from families who are not members of the Church. In-

5.  *See* generally the testimony of William Johnson, Principal of the North Valley Christian School.

6.  During the course of this litigation, the North Valley Baptist Preschool changed its name to the "North Valley Preschool Parent Co-operative."

deed, fully two-thirds of the children presently in attendance are from non-member families.

The Preschool ambitiously seeks to provide for the children's "fullest intellectual, physical, social, emotional, and spiritual development." To do so, the Preschool offers a highly structured educational curriculum during the morning session. Instruction is provided in Bible studies, math, science, art, music, reading readiness, motor development, language, health and safety, literature, and cooking. The afternoon session is considerably less structured, with an emphasis on special activities, stories, and playtime. Throughout the day, of course, the staff attends to the basic needs of the children, such as feeding, hygiene, and supervision.

In exchange for these services, a flat daily fee of $13.50 per child is charged. Since this fee is insufficient to cover operating costs, the Preschool regularly receives substantial subsidies from the Church. In all its years of operation, the Preschool has never turned a profit, nor does it expect to in the near future.

In all respects, the Preschool aspires to operate consistently with the principles and beliefs of the Church. Thus, all Preschool staff, from the director to the maintenance workers, must be members in good standing of the Church. They are expected to conduct themselves, both during work and after-work hours, in an appropriate "Christian manner." Teachers at the Preschool are also expected to infuse the "Word of God" into all aspects of instruction, not just Bible time.

Furthermore, since the Church believes that the primary responsibility for the upbringing of children lies with parents, the Preschool encourages parents to actively volunteer in the operation of the Preschool. While parents do not generally participate in the afternoon session, on most days at least one parent is present at the Preschool throughout the morning session.

To instill learning and self-control, the Preschool has implemented a structured discipline policy. This discipline policy includes, as a last resort, corporal discipline in the form of spankings. Such spankings may be imposed only where alternative methods, such as verbal correction, time-out, or the denial of a privilege, have been employed to no avail. In these extreme instances, the defiant child is removed from the presence of the other children and administered no more than three "swats" on the buttocks in the presence of an adult witness. Afterwards, the child and the teacher administering the spanking pray together and seek God's guidance.

This discipline policy, which is set out in written form in the Preschool's Handbook, is fully explained to all parents prior to enrollment. Indeed, all parents are required to sign an authorization form stating that they "agree to support the school in its discipline policy without reservation." [7]

Without much significant change, the Preschool has been operating as described above for the past sixteen years. When it first opened, the Preschool applied for and received a license from the state as required by law. It subsequently renewed that license each year for nine years, up until 1981. During that period, the Preschool experienced no difficulties with the state licensing authorities.

In 1981, however, Pastor Blue, after consultation with the Board of Deacons, received the conviction that the license for the Preschool should not again be renewed. As Pastor Blue explained to the parents of enrolled children, this conviction arose from his beliefs regarding "the historic and proper role of government." Over the past several years, according to Pastor Blue, the state government has "crossed the invisible line" and has begun to "eliminate the historical and constitutional right of the church to minister to the needs of the people without interference from government." Pastor Blue concluded that "renewing of our preschool license is a clear violation of the Lordship of the Lord Jesus Christ over our church."

---

7. *See* plaintiffs' Exhibit 5.

Consequently, the Preschool has been op-erating without a license since 1981. Fur-thermore, the operators of the Preschool do not consider themselves bound by the ad-ministrative regulations which implement the state licensing scheme. They will not file compliance reports with DSS, nor will they allow DSS officers on the premises of the Preschool for inspection. They will, however, on a "voluntary basis" comply with those particular provisions which they feel promote fire, health, and safety con-cerns.

Parents, by and large, seem satisfied with the care offered at the now-unlicensed Preschool. Yet the operation of the Pre-school has not proceeded entirely without incident in recent years. On at least two occasions, Preschool staff have adminis-tered corporal discipline in a manner incon-sistent with the stated discipline policy.[8] These deviant episodes, which involved dis-cipline by means of pinching and slapping, did not result in serious injury to the chil-dren. In addition, on at least one occasion, Preschool staff refused to allow the State Fire Marshal to enter the facility to per-form a routine fire inspection.[9]

In terms of program content, the Pre-school has experienced no changes whatso-ever after its decision to operate without a license. It continues to offer the same "Christ-centered" curriculum that it of-fered prior to 1981.

PROCEDURAL BACKGROUND

After the expiration of the Preschool's license, DSS notified the operators that they were not in compliance with state law.

DSS thereafter issued two cease and desist orders. Finally, DSS referred the case, along with approximately thirteen other cases involving non-licensure of religiously-affiliated preschools, to the California At-torney General for prosecution.

At that time, a bill was pending before the California Legislature seeking to ex-empt religiously-affiliated preschools from licensure. Consequently, the Attorney General agreed to stay enforcement pro-ceedings pending legislative resolution. The bill eventually was defeated by the legislature.

On June 14, 1984, the underlying action for declaratory and injunctive relief was filed in this court. Plaintiffs are the North Valley Baptist Church, the Pastor Royal Blue, Wendy Stone (director of the Pre-school), and David Sprague (parent of a child who was then a student at the Pre-school). Defendant is Linda McMahon, sued in her capacity as director of the California Department of Social Services.

Plaintiffs' complaint sets forth a broad-based challenge to the constitutionality of the Child Care Facilities Act as applied to the North Valley Baptist Preschool. Many of the claims raised therein were adjudi-cated by way of summary judgment or waived by non-inclusion in superceding pre-trial pleadings.[10] By the time of trial, the only claims remaining in this action were free exercise, establishment, equal protec-tion, and parental rights.[11]

Over the course of the two week trial, the court heard detailed oral testimony and

---

**8.** *See* defendant's Exhibit S.

**9.** *See* defendant's Exhibit YYY.

**10.** Plaintiffs' claims for overbreadth, vagueness, due process, and ultra vires were adjudicated by summary judgment in favor of defendant. Plaintiffs' claims for free speech, freedom of association, and right to privacy were not in-cluded in the final pretrial order to which all parties acceded. *See Southern California Retail Clerks Union v. Bjorklund,* 728 F.2d 1262, 1264 (9th Cir.1984) ("issues not preserved in the pre-trial order have been eliminated from the ac-tion").

**11.** In their trial brief, plaintiffs for the first time attempted to argue that, as a matter of statutory construction, the Preschool is exempt from li-

censure under Cal.Health & Safety Code § 1596.792. Specifically, plaintiffs contend that the Preschool should be classified as an exempt "parental cooperative." Since plaintiffs neither sought nor were granted leave to present this new argument, it is not properly before the court. In any event, the court notes that the Preschool plainly does not satisfy the require-ments for classification as a parental coopera-tive. Care is not exclusively (or even predomi-nately) provided by participating parents. More importantly, payment of money is routinely ex-changed, care is provided outside the home of participating parents, and more than 12 chil-dren are receiving care at the same time.

admitted numerous documents into evidence in this action. As will be explained further below, much of this evidence surprised not only the court, but apparently all counsel as well. In particular, many issues previously touted as crucial by counsel vanished upon presentation of evidence by their clients. Therefore, while this action once promised to present formidable and sensitive questions of constitutional law, by focusing on evidence rather than rhetoric the court now has little difficulty in reaching the conclusions set forth below.

DISCUSSION

I. FREE EXERCISE CLAUSE

The preeminent claims asserted by plaintiffs arise under the free exercise clause of the first amendment. The free exercise clause protects two types of religious freedom: the freedom to believe and the freedom to act. While the freedom to believe is absolute, the freedom to act is limited. *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972). In other words, even though an action is motivated by religious convictions, it is not thereby immunized from all possible legislative restrictions. Rather, to determine whether such legislation violates the free exercise clause, a careful balancing of the competing religious and legislative interests is required. *Id.* at 221, 92 S.Ct. at 1536.

The Ninth Circuit has developed a three-pronged test to be used for this free exercise balancing. The court must consider:

(1) The magnitude of the statute's impact upon the exercise of religious belief;

(2) The existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief;

(3) The extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*EEOC v. Fremont Christian School*, 781 F.2d 1362, 1367 (9th Cir.1986) (*citing Wisconsin v. Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533 and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

The burden of proof with respect to the first prong lies with plaintiffs; if satisfied, the burden of proof with respect to the last two prongs shifts to defendant. *Callahan v. Woods*, 736 F.2d 1269 (9th Cir.1984).

In their free exercise claims, plaintiffs herein challenge the Child Care Facilities Act as applied to their Preschool in the following ways: Initially, and most comprehensively, plaintiffs challenge the type of regulation imposed upon the Preschool, i.e., licensure. Regardless of whether any of the particular implementing regulations conflict with their beliefs, plaintiffs assert that the requirement of licensure in and of itself indirectly burdens their religious expression. Based on this burden, plaintiffs seek an exemption from the entire licensing scheme. Alternatively, and more narrowly, plaintiffs challenge those particular provisions which they contend directly burden their religious expression: the corporal punishment provision, the criminal record clearance provision, and the religious services provision. Based on these burdens, plaintiffs seek exemptions from the particular offensive provisions.

### A. Challenge to the Type of Regulation: The Licensure Requirement

1. Burden on Religious Expression

According to the stipulated facts, plaintiffs sincerely hold as a religious conviction that Jesus Christ is the Lord and ultimate authority over the Church. The Preschool, according to plaintiffs, is an integral ministry of this Church. Therefore, although plaintiffs have previously licensed the Preschool, plaintiffs now believe that further submission to such licensure would violate their religious conviction regarding the Lordship of Christ over the Church. Upon reflection and prayer, plaintiffs have reached the conviction that licensure of the Preschool would demonstrate their acceptance of the authority of the state over Jesus Christ in the operation of the Church itself. Plaintiffs sincerely believe that such conduct on their part would be sinful in the eyes of their Lord.[12]

---

12. *See* Undisputed Facts Nos. 3, 6, and 10 listed in the Pretrial Conference Order.

Since each of the above key facts has been stipulated, the court necessarily finds that plaintiffs' refusal to submit the Preschool to licensure is motivated by sincerely held religious beliefs. Parenthetically, the court notes that it is not within the judicial function to inquire into the truth, validity, consistency, or reasonableness of these beliefs. *Callahan v. Woods,* 658 F.2d 679 (9th Cir.1981). For this reason, it is of little moment that aspects of the Church's other religious ministries are licensed,[13] or even that the Preschool itself was licensed in the past, prior to the Church's evolution in doctrine regarding licensure. *See Thomas v. Review Board,* 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) ("Courts should not undertake to dissect religious beliefs because the believer admits that he is struggling with his position."); *Forest Hills Early Learning Center v. Grace Baptist Church,* 846 F.2d 260, 263 (4th Cir.1988) ("[R]eligious groups have throughout history reshaped their ministries to respond to changed circumstances.")

■ Because of these beliefs, plaintiffs contend that their religious expression is severely burdened by the licensure requirement of the Child Care Facilities Act. In this regard, plaintiffs rely on the doctrine of indirect compulsion established in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Said doctrine applies where the state does not affirmatively compel a violation of conscience, but rather forces a choice between fidelity to religious belief or receipt of an important government benefit. As succinctly stated in *Thomas:*

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, ... thereby putting substantial pressure on an adher-

ent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Id.* at 717–18, 101 S.Ct. at 1431–32 (holding that a state may not deny unemployment benefits due to claimants' refusal to accept employment which conflicts with religious beliefs). Just like direct compulsion, indirect compulsion achieved by the conditions attached to the receipt of government benefits is subjected to strict scrutiny under the free exercise clause. *Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987).[14]

Within this framework, plaintiffs' situation is a bit atypical since they are not voluntarily seeking aid or assistance from the government. Indeed, if it were up to plaintiffs, they would much perfer to operate without any input from the government. The state, however, has conditioned the lawful operation of a preschool upon the procurement of a license from the state. In other words, the operation of a preschool in California is a state-granted privilege to which the condition of licensure is attached. Since plaintiffs cannot acquire this privilege without subjecting themselves to a condition in violation of their beliefs, the doctrine of indirect compulsion is fully applicable. *See New Life Baptist Church Academy v. Town of East Longmeadow,* 666 F.Supp. 293 (D.Mass.1987) (doctrine of indirect compulsion applies where plaintiffs hold religious objection to state requirement that school submit an application for state approval).

While conceding that plaintiffs' refusal to submit the Preschool to licensure is religiously-motivated, defendant nevertheless contends that plaintiffs' conduct is not entitled to free exercise protection. According to defendant, such protection is not war-

---

**13.** For example, the Church is incorporated under state law and the buses operated pursuant to the "bus ministry" are each licensed by the state.

**14.** In *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), the plurality of a sharply divided Court suggested that the less rigorous "minimal scrutiny" standard should apply in the

context of indirect compulsion. Thereafter, in *Hobbie* the majority of the Court roundly rejected this suggestion, stating "such a test has no basis in precedent and relegates a serious First Amendment value to the barest level of minimal scrutiny that the Equal Protection Clause already provides." 107 S.Ct. at 1049.

ranted because plaintiffs' objective—the operation of a preschool—is secular, not religious, in nature. Defendant relies on several decisions emanating from the state appellate courts which reject free exercise challenges to preschool licensure requirements for this very reason. *See Department of Social Services v. Emmanuel Baptist Pre–School,* 150 Mich.App. 254, 388 N.W.2d 326 (1986); *Kansas ex rel. Pringle v. Heritage Baptist Temple, Inc.,* 236 Kan. 544, 693 P.2d 1163 (1985); *Texas v. Corpus Christi People's Baptist Church, Inc.,* 683 S.W.2d 692 (Tex.1984); *North Carolina v. Fayetteville Street Christian School,* 42 N.C.App. 665, 258 S.E.2d 459 (1979), *vacated and remanded on other grounds,* 299 N.C. 351, 261 S.E.2d 908, *vacated and remanded on other grounds following reh'g,* 299 N.C. 731, 265 S.E.2d 387, *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980); *see also Forest Hills Early Learning Center v. Lukhard,* 661 F.Supp. 300 (E.D.Va.1987), *rev'd on other grounds,* 846 F.2d 260 (4th Cir.1988). In each of these factually similar cases, the respective courts found that plaintiffs held a sincere religious objection to the procurement of a license for the religiously-affiliated preschool. However, the courts concluded that no burden on religion expression resulted since the operation of a preschool is a predominantly secular activity.

■ Upon review and analysis, this court expressly rejects the rationale of these state court decisions. Under the doctrine of indirect compulsion, the government benefit sought by plaintiffs need not be religious in nature to enable plaintiffs to claim free exercise protection. Notably, in *Thomas* and *Verner,* the government benefit sought by plaintiffs was the receipt of unemployment benefits, a purely secular objective. The focus, rather, is on the nature of the conditions attached to the receipt to such benefits. So long as compliance with these conditions would demonstrably offend plaintiffs' religious beliefs, plaintiffs are entitled to the protections of the free exercise clause.[15]

■ In short, the record demonstrates that the Child Care Facilities Act presents plaintiffs with a Hobson's choice: in order to lawfully operate their Preschool, an objective they feel mandated to pursue, they must submit the Preschool to state licensure, a condition they believe to be sinful. Literally and figuratively, the plaintiffs are damned if they do and damned if they don't. Given this scenario, the court concludes that the licensure requirement of the Act imposes a substantial burden upon plaintiffs' religious expression.

### 2. Compelling State Interest

As indicated earlier, the mere fact that plaintiffs' religious expression is burdened by the licensure requirement does not necessarily mean that an exemption must be granted. The state may justify the inroad on religious expression by demonstrating that it is necessary to achieve a compelling state interest. *Thomas,* 450 U.S. at 718, 101 S.Ct. at 1432.

According to its stated purpose, the licensure requirement of the Child Care Facilities Act is designed to protect the health and safety of children receiving care outside their home. Without hesitation, the court finds this to be a compelling state interest of the highest order. *See Prince v. Commonwealth of Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 *reh'g denied,* 321 U.S. 804, 64 S.Ct. 784, 88 L.Ed. 1090 (1944); *Rush v. Obledo,* 756 F.2d 713 (9th Cir.1985). As stated in *Prince,* "it is too late now to doubt that legislation designed to reach evils [affecting children] is within the state's police power, whether against the parent's claim to control the child or one that religious scruples dictate contrary action." *Id.* at 167, 64 S.Ct. at 442–43.

In a preschool setting, the state's interest in protecting the health and safety of

15. As will be noted below, however, the issue of whether the operation of a preschool is predominantly religious or secular in nature will be important with regard to plaintiffs' establishment claim. In this regard, the analyses provided by the above-mentioned decisions proved useful.

children is particularly acute. Preschool children are of an especially tender age, generally 2½ to 6, and are placed in out-of-home group care for many hours of the day. These children are at the most vulnerable and impressionable period of their lives. Generally such children are incapable, both physically and emotionally, to fulfill their most basic needs and/or to speak out for themselves. Consequently, the hazards posed by preschools are great in magnitude and frequently susceptible to easy concealment. Such hazards, to name just a few, include over-capacity, lack of supervision, accessibility to chemicals, structural hazards, and sexual or physical abuse. *See Rush v. Obledo,* 756 F.2d at 720 (in light of the enormity of these hazards, the court upheld warrantless inspection provision over a fourth amendment challenge). For all these reasons, the state's interest in protecting its very young while in a preschool setting is most compelling indeed.

Furthermore, the record plainly reveals that the comprehensive licensing scheme is an effective method to advance this compelling interest. As is apparent from both the legislative mandate and the implementing regulations, the predominant orientation of the licensing scheme is to promote the health and safety of the children. Not only is this orientation obvious from a lay perspective, but several experts in childhood development confirmed that the licensing scheme is appropriately designed to address those health and safety concerns which have the greatest impact upon young children in institutionalized care.[16]

The utilization of a licensing scheme, as opposed to other forms of government regulation, to address these health and safety concerns has a number of distinct advantages. Most important is the breadth of power given to the implementing agency in the areas of prevention, monitoring, and enforcement. As indicated earlier, this particular licensing scheme allows random monitoring inspections, requires regular compliance reports, and permits informal and speedy administrative enforcement, thereby presenting a uniquely encompassing and efficient form of regulation.[17]

This is hardly to suggest that licensing is a panacea to all social ills. As several experts testified, preschool licensing cannot guarantee the *elimination* of all health and safety hazards to the attending young children. Preschool licensing can, however, significantly *reduce the risk* of such hazards. Given the magnitude of the interests at stake, even the slightest reduction of the health and safety risks posed in the preschool setting constitutes a governmental achievement of the greatest magnitude.

In sum, the record amply demonstrates that the licensure requirement effectively advances a compelling, indeed paramount, state interest—protection of the health and safety of young children.

### 3. Feasibility of Exemption

The determinative factor, therefore, becomes the third prong of the analysis: the extent to which recognition of an exemption from the licensure requirement would impede the objective sought to be advanced by the state. In this context, defendant bears the burden of demonstrating that alternative forms of regulation which might accommodate plaintiff's beliefs would not be feasible methods to achieve state objectives.

Defendant herein faced some especially frustrating obstacles in its efforts to discharge this burden. Most importantly, the exact type of exemption sought by plaintiffs and acceptable to their beliefs was never clearly defined by plaintiffs themselves. Not being thoroughly versed in plaintiffs' beliefs, defendant was therefore placed in a quandary. It would, of course, be fruitless for defendant to consider and

---

**16.** *See generally* the testimony of David Beard (expert in day care licensing) and Dr. David Chadwick (expert in pediatrics and child abuse). Indeed, even Pastor Royal Blue, when asked to identify those provisions which did *not* advance health and safety, identified only one such provision—the religious services provision.

**17.** *See* the testimony of David Beard and Fred Miller, experts in day care licensing. To the extent that their testimony is contradicted by the testimony of Dr. Watson, the court expressly finds the testimony of the former experts to be more credible.

implement an alternative form of regulation only to find that this alternative was equally objectionable to plaintiffs' beliefs.

At trial, plaintiffs' counsel suggested that an acceptable alternative form of regulation might be *registration*. "Registration", as the experts inform us, is an imprecise term which defines a variety of divergent types of government regulation. The common distinguishing element of registration is the relative laxity of state oversight. Generally, under the registration method, the regulated entity must file an initial registration statement with the state which demonstrates that it complies with all governing standards. Often without an inspection, the entity may then lawfully proceed to operate. Thereafter, the entity bears a continuing responsibility to comply with the governing standards. The state, however, has little, if any, powers to monitor and ensure ongoing compliance. Usually, the state will have no further involvement with the regulated entity until and unless a complaint is brought to its attention by a consumer. In such instances, if state enforcement is deemed necessary, it is generally accomplished through formal legal procedures, as opposed to informal administrative procedures.[18]

A few states currently employ dual methods of regulation for preschools: the licensure method for nonsectarian preschools and the registration method for religiously-affiliated preschools.[19] Referring to these state systems as examples, plaintiffs' counsel contends that implementation of a similar registration alternative in California would satisfy the twin goals of (1) acceptability to plaintiffs' religious beliefs and (2) feasibility to achieve the state's objectives. Without a close review of the record, such a "compromise" solution might appear inviting. The evidence, however, demonstrates that this suggested alternative in fact fails to satisfy either goal.

First, the uncontroverted evidence demonstrates that registration, at least in its generally known form, would *not* be acceptable to plaintiffs' religious beliefs.[20] As plaintiffs testified, the sole reason each objects to the present licensure method of regulation is because it compels the Preschool to submit itself before the state for approval. Such approval, according to plaintiffs, acknowledges the authority of

18. In short, the primary difference between the licensure and the registration methods of regulation is the breadth of state powers in the areas of monitoring and enforcement. Under the licensure method, the state plays an active and ongoing role in monitoring and enforcement; under the registration method, the state plays a much more passive role.

19. States employing this dual method of preschool regulation include Arkansas, Indiana, Missouri, and Alabama. The precise nature of the registration methods applied by these states to religiously-affiliated preschools varies significantly. At one extreme, some states utilize a method of registration which appears to be licensure in disguise. In these states, the regulatory scheme applicable to religiously-affiliated schools does not differ appreciably from the licensing scheme. The states merely define the alternative method as "registration" rather than licensure in an effort to make the regulatory scheme more palatable to persons holding a religious conviction against licensure. At the other extreme, some states utilize a "textbook" method of registration which differs considerably from the licensure method. In these states, the religiously-affiliated preschools need only file a registration statement demonstrating compliance with governing standards, and the state thereafter limits its involvement to responding to complaints from outside sources.

20. As shall become evident, this is but the first of many instances wherein counsels' characterization of plaintiffs' beliefs and practices differs radically from the evidence adduced at trial. This recurrent problem, afflicting both plaintiffs' and defense counsel alike, is probably a consequence of their mutual decision to designate this action as a representative "test" case. As a result, both counsel litigated the action according to a broad political agenda of their own, with nearly complete disregard for the particular circumstances of these particular plaintiffs.

Religion claims, however, especially free exercise claims, cannot be adjudicated *en masse* from an intellectual ivory tower. To the contrary, this court bears the responsibility to carefully focus on the *evidence* concerning the *particular parties* before it. Unfortunately, the court received little assistance from counsel in this regard. These observations are included herein not merely to chastise present counsel, but hopefully to encourage a more direct approach in any future litigation in this controversial area.

the state, rather than God, over the Church and its ministries. Moreover, *any* regulatory program which similarly compels the Preschool to obtain approval from the state prior to operations, whether denominated "licensure" or "registration", would be equally objectionable to plaintiffs. As Mr. William Johnson, Director of the elementary school ministry and a Church member, flatly stated, registration of the Preschool would constitute state approval of the ministry and would, therefore, constitute a violation of religious doctrine. Hence, as relates to the goal of accommodating the religious beliefs of *these* plaintiffs, implementation of registration as an alternative to licensure would be pointless.

Second, even assuming that the registration alternative *was* acceptable to plaintiffs' religious beliefs, the evidence further demonstrates that registration would not adequately advance the state's objectives. Based on its review of the needs of children and parents in this state, the California legislature has determined that the health and safety components of day care centers, including preschools, require rigorous quality assurance. The registration method, even in conjunction with the input of concerned parents, simply cannot provide that level of assurance.

Experts in child care regulation most convincingly explained the shortcomings of the registration method specifically as applied to the preschool setting. According to these experts, the registration method—which relies on *post hoc* enforcement after receipt of complaints from consumers—is ineffective in the preschool setting primarily for two reasons. First, the consumers who would bear the responsibility for monitoring the preschool, i.e., the parents, do not have sufficient expertise, access, or time to monitor the myriad hazards potentially present in the institutional environment. For example, parents would have limited effectiveness in monitoring such hazards as structural defects, inadequate financial resources, or prior criminal history of an employee.[21] Such hazards may go undetected until it is literally "too late." Second, the hazards posed in the preschool setting are, by and large, not readily amendable to *post hoc* enforcement. In other words, this is not the type of situation where an offending entity may, through the mere payment of a fine or penalty, adequately make amends for any past deficiencies. Affronts to the health and safety of young children may well result in permanent and irreparable injuries. Therefore, an adequate regulatory method in this setting requires the kind of vigorous prevention program which can be provided by a specialized agency with broad powers, such as DSS.[22]

In light of these shortcomings, the court expressly adopts the findings of the day care regulation experts that registration, as compared to licensure, would result in a negative outcome for children at the Preschool. Accordingly, the court concludes that the state's objective of ensuring high quality day care would be substantially impeded through the recognition of an exemption in the nature of registration.[23]

---

**21.** Plaintiffs' own expert in day care licensing, Dr. Watson, conceded that self-monitoring of preschools was an adequate method only with respect to those areas where parents possess expertise, such as the daily activities of the children. Dr. Watson concluded that self-monitoring would not be effective in such areas as nutrition and health.

**22.** *See* the testimony of David Beard and Fred Miller. These expert opinions are not without empirical support within the State of California. Approximately five years ago, California instituted an experimental registration program for family day care homes. Due to the inadequate results achieved, the program has been discontinued.

**23.** The mere fact that several other states utilize a registration alternative, with apparently satisfactory results, is of limited consequence in this action for two reasons: First, the extent of government regulation of day care is particularly a matter of local concern. The level of quality assurance deemed necessary may vary significantly from state to state depending on such factors as the number of children receiving such care and the past history of abuse. California may legitimately choose to require a higher uniform level of care, or insist on more effective enforcement measures, than other states may feel necessary given their local conditions.

Second, in each of those states, the exemption was granted by state legislative fiat, not by federal court order over state opposition. As the

The other suggested alternative to licensure, and the only one which would clearly be acceptable to plaintiffs' beliefs, is the laissez-faire method—essentially the lack of any state regulation specifically directed at the day care aspects of the Preschool.[24] Obviously this method, which provides even less direction and state power than the registration method, would likewise fail to adequately advance state objectives. In addition to the shortcomings previously described, further problems presented by the laissez-faire method include the lack of a universal standard for high quality of care, the complete absence of any informal prevention and enforcement mechanisms, and the sacrifice of the specialized experience and expertise of the DSS to assist in operations.

In sum, defendant herein has clearly demonstrated that none of the alternatives to licensure, even assuming acceptability to plaintiffs' beliefs, would adequately advance the state's objectives. The very reason for the enactment of the Child Care Facilities Act, after all, was to eliminate inconsistent, self-monitored levels of care. Given the compelling nature of its interest in the health and safety of young children, the state is fully justified in its demand for strict accountability from its day care providers.

### B. Challenge to Specific Substantive Provisions

If, as determined above, the free exercise clause does not entitle plaintiffs to an exemption from the entire licensing scheme, plaintiffs alternatively seek exemptions from specific substantive provisions of the scheme. Although three separate free exercise claims are asserted in this regard, they share a common denominator: none finds any factual support in the record. While counsel had repeatedly represented to the court that compliance with these provisions would conflict with plaintiffs' religious beliefs, in fact the evidence adduced at trial demonstrates that each provision is perfectly compatible with the exercise of plaintiffs' faith. Thus, with respect to each of the three specific provisions challenged, plaintiffs failed to satisfy their burden on the first prong on the three-pronged test.

### 1. The Corporal Punishment Provision

As explained earlier, the Preschool staff utilize a discipline system which includes, as a last resort, spankings administered by a teacher and witnessed by an adult. Under the licensing scheme, however, such spankings would be prohibited by virtue of

Supreme Court recently clarified, the legislature is free to grant religious organizations exemptions *beyond* those mandated by the free exercise clause. *Corporation of Presiding Bishop v. Amos*, 483 U.S. ——, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). Thus, the states permitting the registration alternative may well have chosen to voluntarily provide exemptions not necessarily required by the free exercise clause. *See Forest Hills Early Learning Center, Inc. v. Grace Baptist Church*, 846 F.2d 260 (4th Cir.1988) (legislatively-created religious exemption from preschool licensing upheld under the establishment clause, even though the court had found that the accommodation was not *mandated* by the free exercise clause). By contrast, where the legislature chooses *not* to grant an exemption, as in California, the limited issue before the reviewing court is whether the exemption is indeed mandated by the free exercise clause. *See Braunfeld v. Brown*, 366 U.S. 599, 608, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 *reh'g denied*, 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed. 69 (1961) (in discussing alternatives to the Sunday closing laws, the Court observed, "A number of States provide such an exemption, and this may well be the wiser solution to the problem. But our concern is not with the wisdom of legislation but with its constitutional limitation.")

Given the above-noted differences in factual conditions and governing legal standards, it is perfectly consistent for the legislatures in other states to voluntarily grant a particular exemption, while this court determines that California cannot be constitutionally compelled, against the wishes of its legislature, to grant a similar exemption.

**24.** Under this method, the Preschool would be bound to comply with all health and safety standards of general application (e.g., fire codes, criminal provisions), but not those provisions promulgated under the Child Care Facilities Act. Accordingly, as applied to the Preschool, the DSS would forfeit all prevention, monitoring, and enforcement powers it otherwise possesses in relation to day care centers. Instead, the Preschool staff, with the significant involvement of parents, would be entrusted to self-monitor all health and safety conditions. This laissez-faire method satisfies plaintiffs because it allows the Preschool to operate without seeking or receiving approval from the state.

the corporal punishment provision, § 101223(3).[25]

To establish and defend the free exercise claim with respect to this provision, much evidence was produced at trial concerning the relative benefits and dangers posed by the spanking of young children. Plaintiffs began by stating their impression that spanking was an appropriate tool to instill respect and righteous behavior. Thereafter, a veritable parade of experts, from child psychologists to pediatricians, rendered their respective opinions on the subject. As might be expected, some experts felt that moderate physical discipline was healthy and beneficial; other experts felt that moderate physical discipline posed grave risks of physical and emotional abuse.

While all this evidence was quite interesting (as well as time-consuming), it simply missed the point. In the context of this free exercise claim, this court is not concerned in the abstract with whether the spanking of young children as a disciplinary measure is a "good idea" or a "bad idea." Rather, the threshold issue is whether the specific conduct prohibited by the state—the spanking of children in a preschool setting—is central to plaintiffs' sincerely held religious beliefs. In other words, to satisfy their burden on the first prong of the free exercise analysis, plaintiffs must establish that beliefs which are centrally rooted in *religion*, not child psychology or pediatrics, would be genuinely burdened by the prohibition of spankings at the Preschool.

[■] In an attempt to sustain the burden on this first prong, plaintiffs' counsel raised a novel argument. Counsel elicited testimony demonstrating simply that the spanking of children at the Preschool is *permitted* by plaintiffs' religious beliefs. Because the conduct is permitted by religion, counsel concluded that the prohibition of this conduct must necessarily impose a genuine burden on religious expression. Said argument reflects a fundamental, and in this action a recurrent, misperception of the nature of a free exercise claim. Simply stated, it does not follow that all conduct which is merely permitted by a religion is necessarily central to the expression of that religion. Given the breadth of possible behaviors in day-to-day life, in any religion a multitude of divergent conduct may be permitted, tolerated, encouraged, or condoned. Much of this conduct will be of limited, if any, religious significance and its prohibition, therefore, would be of little burden to the exercise of that religion.[26] Consequently, to sustain a free exercise claim plaintiffs must demonstrate not only that the subject conduct is religiously permitted, but further that the conduct is religiously mandated or otherwise so central to belief that its prohibition would impose a genuine burden on religious expression.

[■] On this significant point, however, counsel did not elicit any pertinent testimo-

**25.** Plaintiffs refer to their system as "corporal discipline" as opposed to "corporal punishment." According to plaintiffs, "discipline" is used to guide and train a child, whereas "punishment" is used to chastise a child. This distinction has significance to plaintiffs' faith, since "discipline" is permitted but "punishment" is not. Regardless of plaintiffs' characterization, it is undisputed that the spankings administered at the Preschool would be considered corporal punishment within the meaning of § 101223(3), and thus prohibited thereby.

**26.** At the risk of belaboring the obvious, a few examples may be in order. On the one hand, some conduct may be permitted by a religion merely because that conduct is of no importance to religious doctrine. For example, the eating of red meat may be permitted by a religion simply because that religion attaches no spiritual significance to diet. Therefore, a state prohibition against eating red meat would not burden the exercise of this religion, despite the fact that the prohibited conduct was permitted by the religion. On the other hand, some conduct may be of spiritual significance, but the religion permits a variety of divergent behaviors. For example, the involvement in "charitable works" may be encouraged by a religion as an ethical imperative which could be fulfilled through any of a variety of channels. Assuming other possible channels were undisturbed, the state prohibition of one type of charitable work would burden the exercise of this religion little, if at all.

Thus, it is manifest that the mere showing that conduct is permitted by religion does not necessarily establish that the prohibition of that same conduct would be violative of religion or otherwise significantly burdensome thereto.

ny. No witness was asked to testify concerning whether the administration of spankings at the Preschool was religiously compelled, nor was any witness asked to testify concerning any resultant burden to religious expression if such spankings were forced to cease.

Due to this critical void in the testimony as elicited by counsel, the court undertook to question Pastor Blue directly concerning the relationship of spankings in the Preschool to the exercise of religious faith. In this regard, Pastor Blue should be credited for his straightforward responses. In no uncertain terms, the Pastor clarified that while the imposition of corporal discipline is indeed *permitted* by the Church, it is not thereby *mandated*. According to the tenet of the Church, the ultimate responsibility for discipline lies with the parent, who should be quick to discipline in order to promote righteous behavior, but not necessarily through corporal means.

Furthermore, even in situations where the parent may prefer the imposition of corporal punishment, the Preschool staff is not religiously mandated to administer such punishment *in absentia*. By way of example, the Pastor related the disciplinary procedure utilized at the Sunday School ministry. When a child is defiant at Sunday School, the staff does not administer corporal discipline, but instead contacts the parents who can then administer such discipline themselves, if so desired. When asked whether the Preschool could, consistent with religious beliefs, implement a similar policy of withholding corporal discipline

and deferring the issue to parents, the Pastor responded "That would be excellent, Your Honor." [27]

As so clarified by the Pastor's testimony, compliance with the corporal discipline provision at the Preschool would not in any manner burden the exercise of plaintiffs' religious beliefs. Preschool staff are *not* religiously mandated to administer corporal discipline. Consistent with the policy already in place at the Sunday School ministry, the Preschool could, in full accordance with faith, merely defer imposition of this limited form of discipline to the parents. While this may not be plaintiffs' preferred course of conduct given their perspectives on *childhood development*, it is an acceptable course of conduct given their perspectives on *religion*.

2. Criminal Records Clearance Provision

■ Turning to the criminal record clearance provision, in this context the state does not prohibit a conduct, but rather compels a conduct. Specifically, the criminal records clearance provision, § 101170, requires every preschool to submit fingerprints of all employees to the state for the preparation of background checks by the state. Prior to trial, it had been represented to the court that compliance with this provision at the Preschool would be violative of plaintiffs' religious beliefs.

As with the corporal punishment issue, however, the testimony elicited at trial belied these representations. Once again, in response to questions posed by the court, Pastor Blue clearly and frankly stated that the Church in fact has no religious objec-

---

27. The especially pertinent portions of the Pastor's testimony are as follows:

"Q. ... Is there anything of religious sorts or otherwise that would mandate extreme conduct of corporal discipline, meaning use of the rod on the child per se?
A. I don't think so.

. . . . .

Q. (Referring to the disciplinary procedure in use at the Sunday school) Does that offend your teaching or beliefs in any way, shape or form that the discipline is not imminent and that the parent must be called to ultimately make the determination as to what form of discipline should be imposed?
A. Oh, no. I wish the parents would do it all.

Q. Why cannot the same form of procedure be utilized at the day school?
A. I would hope it could. We are willing to provide to bring the parents to anything that we could like that.
Q. ... [W]ould it be offensive to your beliefs or your teaching, et cetera, to put or place into practice a set of rules or regulations that would allow discipline of every magnitude save for the use of the rod in preschool and/or if use of the rod is mandated then to exercise the same posture as you do at the Bible School and to bring the parents in?
A. That would be excellent, Your Honor.
Q. Is that objectionable to you?
A. Not at all. We would be glad to do anything of that nature."

tions to the procedure. Pastor Blue testified that the Church's elementary school ministry (grades kindergarten through 12) currently submits fingerprints to the state for the preparation of background checks. Indeed, many times fingerprints are actually obtained from employees of the *Preschool* and submitted to the state for review. Pastor Blue clarified that this procedure does not offend the ministries or his beliefs in any way.

In an attempt to rehabilitate this claim, plaintiffs' counsel raised another novel argument. Counsel argued that while *voluntary* submission of fingerprints may not offend plaintiffs' religious beliefs, *mandatory* submission compelled by the state would. This argument is truly unsupported by the record. As set forth in the Church's bylaws, the Church believes in obedience to state law whenever such law does not conflict with faith. Thus, the submission of fingerprints, otherwise acceptable to belief, does not become sinful in plaintiffs' eyes merely because the state requires it. Counsel's argument to the contrary is directly refuted by Pastor Blue himself. When the court asked, "You have no objection to a *requirement* that you make those checks?", the Pastor replied, "I don't, Your Honor."

Once again, the evidence adduced at trial demonstrates that compliance with the subject provision would be fully consistent with the exercise of plaintiffs' faith.

3. The Religious Services Provision

■ In their final free exercise claim, plaintiffs challenge the religious services provision, § 101223(a)(5). Said provision provides that each child at a day care center shall "be free to attend religious services or activities of his/her choice and to have visits from the spiritual advisor of his/her choice." As explained by plaintiffs, their objection to this provision is based on the assumption that it would prevent the Preschool from offering a mandatory religious curriculum and/or would force the Preschool to open its doors to religious advisors from outside the Church. Plaintiffs contend that compliance with this provision, as so interpreted, would significantly impede the evangelistic and outreach goals of the Preschool.

The uncontradicted evidence, however, demonstrates that the religious services provision is not so interpreted or enforced. As explained by a state official, the referenced "choice" of religious services and advisor is exercised not by the young child, who is deemed without capacity to render such a choice, but by the parent. Moreover, a religiously-affiliated preschool, desirous of a uniform religious orientation, may require the parent, as a condition to admittance of the child, to exercise this choice in accordance with the preschool's orientation. A religiously-affiliated preschool may accomplish this objective simply by fully disclosing its religious orientation and mandatory curriculum to all parents prior to enrollment. In such a circumstance, the preschool may require all children to attend the proffered religious services, and need not permit visits from outside religious advisors.[28]

As so interpreted and enforced, the religious services provision does not conflict with plaintiffs' religious beliefs. Since plaintiffs believe that the ultimate earthly responsibility for the upbringing of children lies with the parents, they heartily concur with the state's practice of allowing parents to exercise religious choices on behalf of their children. Furthermore, the Preschool's policy has always been to fully disclose its religious orientation and mandatory curriculum to all parents prior to admittance of children to the program. Hence, the Preschool already operates in complete compliance with the strictures of the religious services provision. The Preschool need not in any manner alter or discard its mandatory religious curriculum believed necessary to promote evangelism and outreach.

For all these reasons, the court concludes that the California Child Care Facilities Act, as applied to the North Valley Baptist Preschool, does not violate the free exer-

---

**28.** *See* testimony of Joyce Fukui.

cise clause of the first amendment.[29]

## II. ESTABLISHMENT CLAUSE

Plaintiffs further challenge the Child Care Facilities Act under the establishment clause of the first amendment. Generally speaking, the establishment clause implements the doctrine of separation of church and state. As the keynote case of *Lemon v. Kurtzman* recognized, "total separation is not possible in an absolute sense, for some relationship between government and religious organization is inevitable." 403 U.S. 602 at 614, 91 S.Ct. 2105 at 2112, 29 L.Ed.2d 745 (1971). Thus, far from being a wall, the line of separation between church and state is "a blurred, indistinct, and variable barrier depending upon all the circumstances of a particular relationship." *Id.*

■ To determine whether the establishment clause has been violated by a state statute, the court employs yet another three-pronged test:

(1) the statute must have a secular purpose;

(2) the primary affect of the statute must neither advance nor inhibit religion; and,

(3) the statute must not foster excessive governmental entanglement with religion.

*Id.* at 612–613, 91 S.Ct. 'at 2111; *EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1281 (9th Cir.1982).

In the present action, the parties agree that the Child Care Facilities Act satisfies the first two prongs of the test. The scheme has a secular purpose—to promote the health and safety of young children—and, since it applies to nonsectarian and religiously-affiliated preschools alike, its primary affect is neither to advance nor to inhibit religion. The determinative issue, therefore, is whether the Act fosters an excessive governmental entanglement with religion.

Some incidental entanglement between church and state authority is inescapable in our complex modern society, especially as the activities of religious organizations expand into new realms. *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 123, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982). *See also* Marshall and Blomgren, *Regulating Religious Organizations Under the Establishment Clause*, 47 Ohio State L.J. 293 (1986).[30] To determine whether a particular interaction amounts to "excessive", rather than "incidental", entanglement with religion, a number of factors should be evaluated, including "the character and purpose of the institution affected, the nature of the activity engaged in by the government, and the resulting relationship

**29.** At various times throughout this litigation, counsel intimated that substantive provisions in addition to those discussed above would be challenged under the free exercise clause. Indeed, the exact provisions challenged under the free exercise clause were never clearly delineated in either the complaint or the pretrial documents. The court herein has discussed those provisions which emerged as central to the trial proceedings. To clarify the record lest any doubt remain, the court finds that no evidence was presented to establish that compliance with *any* substantive provision of the Child Care Facilities Act would burden plaintiffs' religious beliefs.

**30.** In considering the scope of state regulatory power over religious organizations, Professors Marshall and Blomgren make the following observations:

"The significance of the claim that all activities of religious institutions are entitled to constitutional protections cannot be understood without some understanding of the power and influence currently enjoyed by religious institutions in all aspects of society. To some degree, a complete depiction of 'the religious empire' cannot be drawn because of the secrecy surrounding most church holdings and financial operations. Even so, the relatively limited available information offers staggering numbers and conclusions. The sheer magnitude of corporate religion alone would explain why governmental regulators have taken more than a casual interest.... While the commercial holdings of religious organizations have spawned regulatory conflict, commercial interest alone did not bring churches into the worldly sphere. Contemporary churches, increasingly, contribute community services. In some instances, activities prompted by a sense of mission have resulted in church-operated facilities possessing the attributes and affecting the same public interests as state-operated social service agencies." *Id.* at 316–317.

between government and the religious organizations." *Lemon,* 403 U.S. at 615, 91 S.Ct. at 2112. The central focus should be on the extent that the state becomes involved in *religious* affairs or doctrine. *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). The state may involve itself, even quite pervasively, in the purely *secular* affairs of religious organizations. *Id.*

█ Accordingly, the court first examines the nature of the institution affected—i.e., the North Valley Baptist Preschool. Plaintiffs contend that, as a ministry of the Church, *all* aspects of Preschool operations are *per se* religious rather than secular in nature. Plaintiffs' characterization, sincere though it may be, is not binding on this court. Rather, in the context of this establishment claim, the nature of the Preschool is to be discerned with reference to the objective factors concerning its operations. *See EEOC v. Pacific Press Publishing Ass'n,* 676 F.2d 1272 (9th Cir.1982) (court independently made determination of nature of religiously-affiliated publishing company, despite plaintiffs' assertion that all work conducted at the company *per se* constituted religious activity).

Looking at the objective factors, the court finds that the Preschool has a "mixed" nature, comprised of both religious and secular components.[31] Certain limited aspects of operations are obviously religious in nature, namely, religious instruction, prayer and worship. The remaining aspects of operations, however, are equally obviously secular in nature. The essential function of the Preschool is to provide basic care for young children—including feeding, sheltering, supervising playtime, providing rest and nap time, instructing in secular educational topics and general principles of day-to-day living, monitoring hygiene and health conditions, and protecting from harm. Therefore, while some religious activities are conducted at the Preschool, the operation of the Preschool, viewed overall, is predominantly secular in nature.[32]

The court next examines the nature of the challenged state activity—i.e., application of the Child Care Facilities Act to the North Valley Baptist Preschool. This state activity is designed to promote health and safety concerns only. Most importantly, the licensing scheme leaves unregulated every aspect of the Preschool's operations which are religious in nature. The licensing scheme specifically prohibits any regulation of the content of curriculum. Accordingly, the Preschool is free to offer religious instruction, prayer, and worship without state interference. The licensing

---

**31.** One commentator classifies the activities of religious organizations into one of three classifications:

"The first classification includes those religious or religiously motivated activities that are unmistakably 'secular'. The second includes those religious or religiously motivated activities that arguably infringe upon the concerns of society. Where society has an interest, the state is often led to step forward and police that activity. The third classification includes those activities that even the narrowest of 'religion' definitions must embrace: worship, prayer, the reading of sacred literature, privately or in a house of worship. These engagements enjoy as absolute protections as our legal system can provide.

Taking the generalization a step further, most social and human services ministries come within the second classification: those where the state arguably should exercise its police power."

Esbeck, *State Regulation of Social Service Ministries of Religious Organizations,* 16 Val.U.L.Rev. 1, 33 (1981). Under this analysis, the Preschool falls within the second classification.

**32.** In reaching this conclusion regarding the nature of the Preschool, the court concurs with the four state court decisions, discussed above, which each reached a similar conclusion, albeit in the context of a free exercise claim. *See Department of Social Services v. Emmanuel Baptist Pre–School,* 150 Mich.App. 254, 388 N.W.2d 326 (1986); *Kansas ex rel. Pringle v. Heritage Baptist Temple, Inc.,* 236 Kan. 544, 693 P.2d 1163 (1985); *Texas v. Corpus Christi People's Baptist Church, Inc.,* 683 S.W.2d 692 (Tex. 1984); *North Carolina v. Fayetteville Street Christian School,* 42 N.C.App. 665, 258 S.E.2d 459 (1979), *vacated and remanded on other grounds,* 299 N.C. 351, 261 S.E.2d 908, *vacated and remanded on other grounds following reh'g,* 299 N.C. 731, 265 S.E.2d 387, *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980); *see also Forest Hills Early Learning Center v. Lukhard,* 661 F.Supp. 300 (E.D.Va.1987), *rev'd on other grounds,* 846 F.2d 260 (4th Cir.1988).

scheme only regulates the purely secular aspects of the Preschool's operations—such matters as child-staff ratio, physical structure, minimum personnel requirements, and so on.

Finally, the court examines the resulting relationship between the state and the religious organization. The licensing scheme clearly establishes a pervasive regulatory relationship, complete with ongoing monitoring and supervision. That relationship, however, in no manner affects the religious objectives of the Preschool. Rather, the state can and in the past has implemented its licensing scheme without involving itself in any doctrinal matters of the Preschool or the Church. In the context of direct aid programs, even pervasive monitoring schemes are upheld where the state need not assess doctrinal matters to implement the program. *See Committee for Public Education & Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (system reimbursing religious schools for testing and reporting services). Likewise herein, while the licensing scheme may establish on ongoing regulatory relationship in secular aspects of the Preschool's operations, it will not thereby "entangle" the state, directly or indirectly, in those limited religious components of the Preschool.

## III. EQUAL PROTECTION

A variety of facilities offering short-term care for children are not considered "day care centers" by DSS and, therefore, are not required to be licensed under the Child Care Facilities Act. Such facilities include, for example, drop-off services at recreational areas such as bowling alleys, ski lodges, and shopping centers; summer youth camps; and vacation bible schools. Plaintiffs contend that application of the licensing scheme to the Preschool, while such other facilities remain free from licensure requirements, deprives them of equal protection of the law.

Initially, the court must determine the standard of review to be applied to this equal protection claim. Under well-established precedent, heightened scrutiny (strict or intermediate) is employed only where the legislative classification creates a suspect class or addresses a fundamental right. *Police Dep't v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). In all other situations, the minimal scrutiny test applies. *Id.*

Because the Preschool is religiously-affiliated, plaintiffs contend that it falls within a suspect class and, therefore, heightened scrutiny is appropriate for its claim. This argument misperceives the nature of an equal protection claim. Where there is no showing of discriminatory motive, the proper focus is not on the particular entity affected, but on the legislative classification created. *See Dumdeang v. Commissioner of Internal Revenue,* 739 F.2d 452 (9th Cir.1984).[33] In the present action, the legislative classification draws no distinctions on the basis of religion. Rather, the pertinent classification is between *all* short-term care facilities (both religiously-affiliated and nonsectarian) and *all* day care centers (both religiously-affiliated and nonsectarian). Since this classification neither creates a suspect class nor addresses fundamental rights, the standard of review is minimal scrutiny.[34]

**33.** In other words, members of suspect classes are not *per se* entitled to strict scrutiny with regard to *any* legislative classification that they may choose to challenge. It depends entirely on whether the legislative classification at issue recognizes and draws distinctions based on that suspect class status.

**34.** At one time, the licensing scheme did contain a classification based on religion. In particular, the licensing scheme previously contained a so-called "faith healing exemption," providing that the scheme did not apply to "any facility conducted by and for the adherents of any well-recognized church or religious denomination for the purpose of providing facilities for the care or treatment of the sick who depend upon prayer or spiritual means for healing in the practice of the religion of such church or denomination." Earlier in this litigation, plaintiffs had contended that this provision impermissibly favored "faith healing religions" over their religion.

Since the provision has now been deleted from the licensing scheme, plaintiffs' claim in this respect is moot. Parenthetically, the court notes that the purpose and effect of the "faith healing exemption" was not to favor a particu-

Under the minimal scrutiny test, a classification will be upheld where it is a rational means of promoting a legitimate government interest. *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751, *reh'g denied,* 471 U.S. 1120, 105 S.Ct. 2370, 86 L.Ed.2d 269 (1985). As state officials explained, the distinction between short-term facilities and day care facilities was drawn to enable the agency to focus its regulatory energies where it is both most needed and most likely to have an impact. Day care centers, which generally provide year-round full-time services to children of working parents who have few other care options, pose great risks for abuse and cause much parental apprehension. Therefore, the highest level of quality assurance is deemed necessary. By contrast, short-term care centers such as those offered at recreational areas create less of a societal concern. Utilization of such services is generally short in duration, occasional in number, and elective on the part of the parent. While these short-term centers do present risks, collectively they have much less impact on children, parents, and citizens in this state than do day care centers.

Focusing its regulatory resources on those areas of most societal concern is certainly a legitimate government interest. Distinguishing between short-term care facilities and year-round day care centers is a rational means of promoting this interest. Consequently, said classification does not violate the equal protection clause.

## IV. PARENTAL RIGHTS

██ Finally, plaintiffs contend that the Child Care Facilities Act interferes with the parents' right to control the upbringing of their children in accordance with their religious beliefs. As the Ninth Circuit has recognized, "one aspect of the religious freedom of parents is the right to control the religious upbringing and training of their minor children." *Grove v. Mead School District No. 354,* 753 F.2d 1528 (9th Cir.), *cert. denied,* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985). Such a parental rights claim is analytically identical to a free exercise claim. *Id.*

For the very reasons set forth at length with regard to plaintiffs' free exercise claims, the court concludes that application of the day care licensing scheme to the Preschool will not unconstitutionally interfere with the parents' right to control the upbringing of their children in accordance with their faith.

In summary, the underlying action, after years of litigation, finally came to focus almost solely on the validity of the licensure requirement. Other seemingly objectionable provisions became less objectionable as plaintiffs' beliefs became known. On the licensure issue, the court acknowledges that application of this requirement to the Preschool will impose a burden on plaintiffs' religious expression. In our society the imposition of such a burden, quite rightfully, requires a state justification of the highest order. The state herein has more than sufficiently justified its action. The state has demonstrated its paramount concern for the health and safety of young children receiving out-of-home care in day care centers. Further, the state has demonstrated that recognition of an exemption from the licensing scheme would significantly impede its ability to promote such health and safety concerns.

Accordingly, the court hereby renders judgment in favor of defendant on all claims.

IT IS SO ORDERED.

---

lar religion, but simply to clarify that faith healing centers, by definition, are not day care centers. "Day care centers", as explained earlier, are defined as facilities which provide *nonmedical* personal services to children. Anticipating possible confusion due to the non-traditional form of their healing services, the legislature included the faith healing exemption to clarify

that such facilities were, for purposes of this provision, providing *medical* services. In short, faith healing facilities were excluded from day care licensing not because of their particular religious affiliation, but because they were (and still are) considered medical centers rather than day care centers.